| | |
|---|---|
| MARCIE FISHER-BORNE, for herself and as guardian *ad litem* for M.F.-B., a minor; CHANTELLE FISHER-BORNE, for herself and as guardian *ad litem* for E.F.-B., a minor; TERRI BECK; LESLIE ZANAGLIO, for herself and as guardian *ad litem* for T.B.Z. and D.B.Z., both minors; SHANA CARIGNAN; MEGAN PARKER, for herself and as guardian *ad litem* for J.C., a minor; LEIGH SMITH; CRYSTAL HENDRIX, for herself and as guardian *ad litem* for J.H.-S., a minor; DANA DRAA; LEE KNIGHT CAFFERY, for herself and as guardian *ad litem* for M.M.C.D. and M.L.C.D., both minors; SHAWN LONG; CRAIG JOHNSON, for himself and as guardian *ad litem* for I.J.-L., a minor; | CIVIL ACTION NO. 1:12-cv-589 |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| JOHN W. SMITH, in his official capacity as the Director of the North Carolina Administrative Office of the Courts; THE HONORABLE DAVID L. CHURCHILL, in his official capacity as Clerk of the Superior Court for Guilford County; and THE HONORABLE ARCHIE L. SMITH III, in his official capacity as Clerk of the Superior Court for Durham County; | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiffs are six North Carolina families. Each plaintiff is a member of a family that consists of a child or children being raised by two gay or lesbian parents who are in a committed, long-term relationship with each other. In each of these loving families, the child plaintiff has a legally recognized parent-child relationship with only one parent (either through

birth or adoption), although, in reality, the child is being raised by both parents. Because of the numerous financial, psychological, and social benefits that flow from a legally recognized parent-child relationship, each of the plaintiff families wishes to apply to establish via adoption a full, legal parental relationship between the child and the second parent. Specifically, in each of the plaintiff families, the non-legal parent wishes to apply to adopt the child or children he or she is currently raising as the partner of the legal parent (a process that is often referred to as "second parent adoption").

2. A second parent adoption is the only way that a family in North Carolina with gay or lesbian parents can ensure (i) that both parents have a legal relationship with their child and (ii) that the child receives the many protections and benefits of a legally cognizable parent-child relationship with both parents. Children who are prevented from having such a legally recognized relationship with both parents suffer numerous deprivations as a result, including exclusion from private health insurance benefits, public health benefits, veterans benefits, disability benefits, social security benefits, life insurance benefits, and workers' compensation, as well as uncertainty about their ability to continue their relationship with their second parent if something should happen to their legal parent. While many other states do grant second parent adoptions in cases when they are in a child's best interests, under the law of North Carolina, as authoritatively construed by the North Carolina Supreme Court in *Boseman* v. *Jarrell*, 704 S.E.2d 494 (N.C. 2010),[1] second parent adoptions are categorically prohibited in North Carolina, resulting in the harms to plaintiffs set forth herein.

3. Plaintiffs therefore bring this action ("Action") because North Carolina's categorical prohibition on second parent adoption violates the constitutional rights and

---

[1] Further references to North Carolina's adoption statutes herein are a reference to those statutes as construed by the North Carolina Supreme Court in *Boseman*.

protections of children, who face direct and substantial deprivations — legal, psychological and otherwise — simply because they are being raised by gay or lesbian parents, and violates the rights of those parents, who face similar direct and substantial burdens on their rights simply because they are gay or lesbian.

4.     There is no basis for the state automatically and categorically to reject any petition for second parent adoption by gay or lesbian parents — without even considering what is best for the child — while simultaneously adjudicating any stepparent adoption petition by a heterosexual stepparent on its merits, according to what is in the child's best interest and otherwise consistent with established procedures.

5.     As a basis for their Action, plaintiffs respectfully allege as follows on the basis of their personal knowledge and otherwise on the basis of information and belief:

<u>**NATURE OF THE ACTION**</u>

6.     This Action is brought under 42 U.S.C. § 1983 against state actors who, acting in their official capacity under color of state law, are responsible for making and enforcing state policies and laws that directly infringe plaintiffs' constitutional rights under the Fourteenth Amendment to the United States Constitution.

<u>**JURISDICTION AND VENUE**</u>

7.     Plaintiffs bring this Action pursuant to 42 U.S.C. § 1983.

8.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343(a)(3) and (4).

9.     All defendants are located, or otherwise are present and conducting business, within the state of North Carolina.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). A substantial part of the events and omissions that gave rise to the plaintiffs' claims occur in this judicial district.

## THE NORTH CAROLINA ADOPTION STATUTES

11.     North Carolina law permits an unmarried individual person to adopt children and does not distinguish, for purposes of approving or denying an adoption, among individuals who are gay, lesbian, or heterosexual.

12.     Nevertheless, the gay and lesbian parents in the plaintiff families cannot petition for adoption jointly (i.e., as a couple), because Section 48-2-301(c) of the North Carolina General Statutes provides that "[i]f the individual who files [an adoption] petition is unmarried, no other individual may join in [that] [p]etition."

13.     Among the plaintiff families, the parent who is prevented from having a legal relationship with his or her child (the "second parent" or the "Second Parent Plaintiff") cannot file for an adoption as an individual unless the existing legal parent (the "Legal Parent Plaintiff") agrees to give up all of his or her existing parental rights. Specifically, under N.C. Gen. Stat. § 48-3-606(9), an adoption petition must include a written consent to the adoption by any existing legal parent, and the existing legal parent must acknowledge that granting the adoption will result in the termination of his or her existing parental rights. Similarly, under N.C. Gen. Stat. § 48-1-106(c), "[a] decree of adoption severs the relationship of parent and child between the individual adopted and that individual's biological or previous adoptive parents" and relieves the former parents "of all legal duties and obligations from them to the adoptee."

14.     Thus, as a result of operation of the law — specifically that cited in paragraphs 11 through 13 above and the North Carolina Supreme Court's decision in *Boseman* — the plaintiff

families are precluded from having both parents be recognized simultaneously as legal parents to their children.

15. North Carolina law does recognize one exception to the termination provision described in paragraph 13. Adoptions by a parent's legal spouse — a stepparent — are exempt from the termination requirement of N.C. Gen. Stat. § 48-1-106. "A stepparent may file a petition under this Article to adopt a minor who is the child of the stepparent's spouse if . . . [t]he parent who is the spouse has legal and physical custody of the child, and the child has resided primarily with this parent and the stepparent during the six months immediately preceding the filing of the petition." N.C. Gen. Stat. § 48-4-101(1). Notably, according to N.C. Gen. Stat. § 48-1-106(d), adoption by a stepparent does not have "any effect on the relationship between the child and the parent who is the stepparent's spouse."

16. N.C. Gen. Stat. § 48-1-101 (18) defines "Stepparent" to mean "an individual who is the spouse of a parent of a child, but who is not a legal parent of the child."

17. North Carolina does not recognize a marriage "between individuals of the same gender." *See, e.g.*, N.C. Gen. Stat. § 51-1.2; N.C. Const. art. XIV, § 6 ("Amendment 1").

18. Because the Second Parent Plaintiffs are not considered to be "spouses" of the Legal Parent Plaintiffs under North Carolina law and cannot become "spouses" under North Carolina law even if they were to marry in another state, they are unable to use the stepparent adoption statute to adopt the children they are raising with their partners, without terminating the parental rights of their co-parents, the Legal Parent Plaintiffs.

19. Prior to December 20, 2010 — when the North Carolina Supreme Court decided *Boseman* — the North Carolina District Court in Durham County entered adoption decrees

allowing unmarried second parents to adopt children without terminating the parental rights of the legal parent.

20.     As discussed in greater detail below, the granting of such adoptions was consistent with actions of courts in numerous other states construing their own statutes, which are similar to North Carolina's. Those courts have recognized that second parent adoption can be granted to unmarried individuals without terminating the legal parent's rights.

21.     Under the practice that existed prior to *Boseman*, adoption decrees allowing unmarried, second parents to adopt children without terminating the parental rights of the legal parent "effect[ed] a complete substitution of families for all legal purposes and establish[ed] the relationship of parent and child . . . between . . . [the non-biological parent] and the individual being adopted," while at the same time "not sever[ing] the relationship of parent and child between the individual adopted and that individual's biological mother." *Boseman*, 704 S.E.2d at 497.

22.     In *Boseman*, the Supreme Court of North Carolina held that the family court lacked subject matter jurisdiction to issue the adoption decree described in paragraphs 19 – 21 above because the type of adoption sought, allowing a legal parent's same-sex partner to become a second legal parent, was not permitted under North Carolina law. *Id.* at 505.

**OTHER STATES GRANT SECOND PARENT ADOPTION, RECOGNIZING THAT SUCH ADOPTIONS ARE IN THE BEST INTERESTS OF CHILDREN**

23.     Courts in many other jurisdictions with adoption statutes similar to North Carolina's permit second parent adoption by unmarried gay and lesbian parents.

24.     For example, courts in California, Indiana, New Jersey, New York, Vermont, the District of Columbia, Delaware, Illinois, Massachusetts, Pennsylvania and Maine have held that their adoption statutes permit second parent adoption, and have explicitly recognized that

permitting second parent adoption furthers the best interests of children. *See, e.g., Sharon S. v. Superior Court*, 73 P.3d 554 (Cal. 2003); *In re Jacob*, 660 N.E.2d 397 (N.Y. 1995); *In re Adoption of B.L.V.B.*, 628 A.2d 1271 (Vt. 1993); *In re Adoption of K.S.P.*, 804 N.E.2d 1253 (Ind. Ct. App. 2004); *In re Adoption of Two Children By H.N.R.*, 666 A.2d 535 (N.J. Super. Ct. App. Div. 1995); *In re M.M.D.*, 662 A.2d 837, 860 (D.C. Ct. App. 1995); *In re Hart*, 806 A.2d 1179 (Del. Fam. Ct. 2001); *In re Petition of K.M.*, 653 N.E.2d 888 (Ill. App. Ct. 1995); *Adoption of Tammy*, 619 N.E.2d 315 (Mass. 1993); *In re Adoption of R.B.F.*, 803 A.2d 1195 (Pa. 2002); *In re Adoption of M.A.*, 930 A.2d 1088 (Me. 2007).

25.  In addition, the laws of Connecticut, Colorado and Vermont expressly authorize second parent adoption. CONN. GEN. STAT. § 45a-724(3); COLO. REV. STAT. § 19-5-203(d.5)(i); VT. STAT. ANN. tit. 15A, § 1-102(b) (2004).

26.  In summarizing the benefits of second parent adoption, the Indiana Court of Appeals found that "[a]llowing a second parent to share legal responsibility for the financial, spiritual, educational, and emotional well-being of the child in a stable, supportive, and nurturing environment can *only* be in the best interest of that child." *In re Adoption of M.M.G.C.*, 785 N.E.2d 267, 270–71 (Ind. Ct. App. 2003).

27.  Other state courts have found that, because second parent adoption furthers the same purpose as stepparent adoptions, statutes like North Carolina's that expressly permit stepparent adoptions should be broadly construed in furtherance of the goal of the statute to permit second parent adoption. *See, e.g., In re Adoption of Two Children By H.N.R.*, 666 A.2d at 539 ("[W]here the mother's same-sex partner has, with the mother's consent, participation and cooperation, assumed a full parental role in the life of the mother's child, and where the child is consequently bonded to the partner in a loving, functional parental relationship, the stepparent

provision of [the New Jersey termination statute] should not be narrowly interpreted so as to defeat an adoption that is clearly in the child's best interests."); *In re Hart*, 806 A.2d at 1186-88 (reading Delaware stepparent exception broadly to further the best interests of the children); *In re M.M.D.*, 662 A.2d 837, 860 (D.C. Ct. App. 1995) (same).

28.     Altogether, 20 states plus the District of Columbia currently permit gay and lesbian parents to obtain second parent or stepparent adoptions.

## WHILE NORTH CAROLINA PROHIBITS ADOPTION BY SECOND PARENTS, NORTH CAROLINA LAWS AND POLICIES OTHERWISE RECOGNIZE THE VALUE THAT GAY AND LESBIAN COUPLES PROVIDE AS PARENTS

### Minimum Standards for Family Foster Homes

29.     There are many ways in which North Carolina law currently recognizes the legitimacy of lesbian and gay parents, and does not prevent gay or lesbian persons from being recognized as parents.

30.     North Carolina's Division of Social Services ("DSS") has the authority to enact foster and adoptive parent eligibility requirements, and has enacted such regulations, which are contained in the Minimum Standards for Family Foster Homes ("Foster Care Standards").

31.     The Foster Care Standards articulate the official state policy as to the placement of children in state-licensed foster care. Such licensure is, as a practical matter, a prerequisite to adoption of any children from the state foster care system.

32.     The Foster Care Standards state, that as a matter of official North Carolina state policy, "Foster parents shall be persons whose behaviors, circumstances and health are conducive to the safety and wellbeing of children." Foster Care Standards § IV.B (rev. Oct. 2002).

33.     The comment to § IV.B of the Foster Care Standards states that sexual orientation is irrelevant to a determination of the suitability of a home for foster parenting:

Regarding "non-traditional" family foster homes, ***the Division of Social Services has no policy that disqualifies any family from consideration based solely on their marital status or sexual preference***. The state DSS position is that the county DSS or other agency must make these decisions based on their assessment of the family's ability to meet the needs of individual children who are in need of family foster home placement. If the agency documents through a thorough assessment that the individual or couple's mar[it]al status or sexual preference will jeopardize their ability to meet the needs of children, then the licensure process should not proceed.

Attorney General guidance from a letter dated August 5, 1991 includes the following, "***From a social work perspective [prohibiting licensing of 'nontraditional' families] is totally irrational in that your sexual orientation per se has no relationship to your ability to parent a child or necessarily represents the best interests of the child.***"

Foster Care Standards, § IV.B (rev. Oct. 2002) (emphasis added), *available at* http://info.dhhs.state.nc.us/olm/manuals/dss/csm-40/chg/CS1213.pdf.

34.     In certifying individuals for foster or adoptive placements, DSS requires that a home study be conducted to determine whether a particular placement would be in the child's best interests. *See* DSS, Administrative Regulations and Procedures, § II.D (rev. Oct. 2002), *available at* http://info.dhhs.state.nc.us/olm/manuals/dss/csm-40/chg/CS1213.pdf. This home study includes an assessment of whether other individuals who are currently in the home, including an unmarried partner, would be suitable caretakers for the children. *Id.*

35.     As described below, DSS places children in the homes of same-sex couples after determining that those placements would be in the best interests of the children.

36.     Adoptions by gay or lesbian individuals in committed long-term relationships are granted in North Carolina after a judicial finding that a life with those parents would be in the best interests of the children. However, as a result of North Carolina law, the second parent within any particular home cannot petition to become another legal parent alongside his or her same-sex partner.

### *De Facto* Parent Doctrine

37.     Notwithstanding the prohibition on petitions for second parent adoption, North Carolina does recognize a limited *de facto* parent doctrine, which allows a judge to award certain limited rights, such as custody and visitation, to a non-legal parent based on that parent's role in the child's life.

38.     A "*de facto* parent" is generally defined to be an "adult who (1) is not the child's legal parent, (2) has, with the consent of the child's legal parent, resided with the child for a significant period, and (3) has routinely performed a share of the caretaking functions at least as great as that of the parent who has been the child's primary caregiver without any expectation of compensation for this care."  Black's Law Dictionary (9th ed. 2009); s*ee also Boseman*, 704 S.E.2d at 503-504.

39.     Under North Carolina law, a *de facto* parent may have standing in certain circumstances to seek visitation or custody of a child.  *See* N.C. Gen. Stat. § 50-13.1(a) (conveying standing to initiate a custody proceeding to any "other person . . . claiming the right to custody of a minor child").

40.     North Carolina courts have awarded joint custody to gay or lesbian second parents under the *de facto* parent doctrine.  *See Mason* v. *Dwinnell*, 660 S.E.2d 58, 63 (N.C. Ct. App. 2008) (affirming award of custody to *de facto* parent); *Boseman*, 704 S.E.2d at 505 (same). Courts have done so in recognition of the significance of the second parent's role in their child's life.  *See*, *e.g.*, *Boseman*, 704 S.E.2d at 503 (nonparent may become a *de facto* parent "when a parent brings a nonparent into the family unit, represents that the nonparent is a parent, and voluntarily gives custody of the child to the nonparent without creating an expectation that the relationship would be terminated").

41.     A court may even award full custody to a *de facto* parent if, in such circumstance, it would be in the best interest of the child.  *Boseman*, 704 S.E.2d at 503–04 ("As a result of the parties' creation, the nonparent became the only other adult whom the child considers a parent.").

42.     Despite the recognition through the *de facto* parent doctrine of a second parent's significant role in the life a child, *de facto* parent status does not create a full parent-child relationship.  While a *de facto* parent may be permitted to make custodial decisions, he or she cannot access and does not receive any of the other attendant rights, privileges and responsibilities that flow automatically from legal parent status.

43.     Moreover, *de facto* parentage can only be awarded by a judge in the context of a custody dispute, and is therefore unavailable to the plaintiff families, who are intact families where both parents agree that they should have joint legal custody and share parental responsibilities and obligations.

### FORBIDDING APPLICATIONS FOR SECOND PARENT ADOPTION ADVANCES NO COMPELLING OR EVEN LEGITIMATE STATE PURPOSE

44.     North Carolina's categorical ban on second parent adoption serves no compelling or even legitimate government purpose or interest.

45.     Any valid interest of the state can be fully vindicated though the current adoption process that applies to all applicants, including stepparents.

46.     The question of whether an adoption by a second parent is in an individual child's best interest can be determined only through an individual review process, not through categorical bans such as that applied in North Carolina.

47.     North Carolina's current foster care and adoption policies do not deny that gay and lesbian individuals are suitable parents.

-11-

48.     There is a consensus in the scientific literature that children raised by same-sex couples are just as well adjusted as children raised by heterosexual couples.

49.     The Legal Parent Plaintiffs and Second Parent Plaintiffs will continue raising the Child Plaintiffs regardless of whether the parent-child relationships between the child and the second parent are legally validated, albeit absent numerous benefits that would come through legal recognition of the parent-child relationships.

50.     Consequently, North Carolina's ban on second parent adoption does not affect the number of children raised by either same-sex or heterosexual couples.

51.     Likewise, a categorical ban on second parent adoption does not eliminate the possibility of custody disputes in families headed by same-sex couples, because second parents who have developed a parent-child relationship already have standing to petition for custody or visitation as *de facto* parents.

## ANY ALLEGED STATE INTEREST IS
## SUBJECT TO HEIGHTENED SCRUTINY

52.     North Carolina's categorical ban on second parent adoption perpetuates historical discrimination against gay and lesbian persons whose sexual orientation is immutable and a core part of their identity.

53.     In the twentieth century and continuing to the present, lesbians and gay men have experienced a history of unequal treatment in the United States because of their sexual orientation.

54.     In the twentieth century and continuing to the present, lesbians and gay men have been subject to discrimination in the United States because of their sexual orientation.

55.     In the twentieth century and continuing to the present, lesbians and gay men have been subject to discrimination in the United States because of perceived stereotypes associated with being lesbian or gay.

56.     In the twentieth century and continuing to the present, lesbians and gay men have been subject to violence in the United States because of their sexual orientation.

57.     In the twentieth century and continuing to the present, lesbians and gay men have been harassed in the United States because of their sexual orientation.

58.     Discrimination against gay and lesbian individuals has, historically, given them limited ability to protect their interests through the legislative process.

59.     In terms of population share, openly gay men and lesbians are under-represented in federal and state elected office, and in the judiciary.

60.     The majority of people in North Carolina in particular, and in the United States generally, do not identify as gay and lesbian.  Gay and lesbian persons are therefore a minority population.

61.     Lesbians and gay men have comparatively little ability to protect their interests through the normal political process.

62.     Other groups that face discrimination in society, such as women and racial minorities, have been able to secure statutory protections against such discrimination through federal civil rights legislation.

63.     With the sole exception of the federal Hate Crimes Act, passed in 2009, lesbians and gay men have secured no such federal non-discrimination protection, even today.

64. Instead, the rights of lesbians and gay men have been voted on at the ballot box repeatedly, with the vote going against the lesbian and gay rights position almost every single time.

65. For many gay and lesbian individuals, their sexual identity is a core part of their identity.

66. Efforts to change a person's sexual orientation through interventions by medical professionals have not been shown to be effective.

67. A person's sexual orientation — heterosexual or homosexual — bears no relation to his or her ability to participate in or contribute to society.

## PARTIES

## PLAINTIFFS

### Marcie and Chantelle Fisher-Borne, and M.F.-B. and E.F.-B.

68. Plaintiffs **Ms**. **Chantelle Fisher-Borne** and **Dr. Marcie Fisher-Borne** are residents of Durham, North Carolina. The Fisher-Bornes have two children: plaintiff **M.F.-B.**, a girl who has just turned four years old, and plaintiff **E.F.-B.**, a baby boy who is now six months old.

69. The Fisher-Bornes have known each other for eighteen years and have lived in a committed relationship for over fifteen years. They had a formal commitment ceremony in 2003 at which time they both hyphenated their last names to recognize their union, and were legally married in the District of Columbia in 2011, although their marriage is not recognized by the State of North Carolina.

70. Chantelle Fisher-Borne is 37 years old and works as a non-profit and public health consultant on community development, housing, and homelessness. Marcie Fisher-Borne,

also 37 years old, works as the Director of Evidence Based Practice at the American Cancer Society and will begin a tenure-track faculty position at North Carolina State University in July.

71.     The Fisher-Bornes met while they were undergraduates at Louisiana State University.  After working summer undergraduate jobs in western North Carolina and continuing as graduate students at UNC-Chapel Hill, they were drawn to the area and never left.  They have lived in the Research Triangle area of North Carolina for over 12 years.

72.     The Fisher-Bornes always wanted to have children, and each of them also wished to give birth to a child.  Marcie Fisher-Borne gave birth to her biological daughter M.F.-B.  Chantelle Fisher-Borne gave birth to her biological son E.F.-B.  Both women were involved in all aspects of the other's pregnancy.  They attended all of each other's prenatal appointments together and made preparations for the arrival of each child together.  Each was present when the other gave birth.

73.     M.F.-B. and E.F.-B. are developing mentally and physically as healthy, well-adjusted children.

74.     M.F.-B. calls Marcie Fisher-Borne "Mommy" and Chantelle Fisher-Borne "Mama."  The Fisher-Bornes have provided the only home that M.F.-B. and E.F.-B. have ever known.  They decided to hyphenate their last names in part because they were advised by their minister that it would help their family be recognized as a cohesive unit.

75.     Their loving, supportive, and healthy family serves the best interests of M.F.-B. and E.F.-B.

76.     Chantelle Fisher-Borne's extended family embraces Marcie Fisher-Borne and both children without reservation.

77.     Marcie Fisher-Borne's father and her larger family now seems to accept Marcie Fisher-Borne and Chantelle Fisher-Borne's relationship and his grandchildren, but that has not always been the case.  Marcie Fisher-Borne and Chantelle Fisher-Borne still worry about what might happen to their family if Marcie Fisher-Borne were to die or become incapacitated and her family members were to challenge Chantelle Fisher-Borne's parentage of M.F.-B.

78.     Despite the fact that both the Fisher-Bornes participate equally in all aspects of raising their children, under North Carolina law, only Marcie Fisher-Borne is recognized as a legal parent to M.F.-B., and only Chantelle Fisher-Borne is recognized as a legal parent to E.F.-B.  Chantelle Fisher-Borne is a second parent to M.F.-B.  Marcie is a second parent to E.F.-B.

79.     Under North Carolina's adoption statutes, Chantelle Fisher-Borne could adopt M.F.-B. only if Marcie Fisher-Borne signed away her own parental rights.  Likewise, if Marcie Fisher-Borne ever sought to adopt E.F.-B., Chantelle Fisher-Borne would be required to sign away her parental rights.  Thus, North Carolina law bars both mothers from being simultaneously recognized as their children's legal parents.

80.     Nonetheless, if Chantelle Fisher-Borne were able to file a petition for a second parent adoption of M.F.-B. and if Marcie Fisher-Borne were able to file a petition for the adoption of E.F.-B., and were either of those petitions to be considered pursuant to other existing law and regulation, on information and belief, these petitions would be granted as in the children's best interests.

81.     The Fisher-Bornes have not yet tried to explain to M.F.-B. or E.F.-B. the different legal statuses that their mothers hold or the effect of those different statuses and the harms they cause.

-16-

82.     The Fisher-Bornes both believe that once either M.F.-B. or E.F.-B. is old enough to understand that his or her bonds with his or her second parent are less legally secure, M.F.-B. or E.F.-B. will experience anxiety and feelings of insecurity about the stability of his or her family.

83.     Although the Fisher-Bornes have undertaken efforts to ensure that each will be able to continue life with minimum legal disruption if the other were to die or become incapacitated, and to avoid the harms that the statutory adoption scheme causes to their family, such steps cannot give their family the full protections of legal parentage.

84.     The insecurity to the Fisher-Bornes caused by North Carolina law was manifest on the night of M.F.-B.'s birth.  When Marcie Fisher-Borne was transferred to the maternal floor of the hospital after four days of labor, the first nurse that the family encountered there demanded Chantelle Fisher-Borne's power of attorney to allow her to remain at Marcie Fisher-Borne's side.  Fortunately, in that instance, the Fisher-Bornes had brought that particular document with them to the hospital.  However, based in part on this experience, they constantly worry that if one of the children were to experience a sudden medical emergency, the second parent would be unable to arrange for proper care.

85.     If either Chantelle Fisher-Borne or Marcie Fisher-Borne were to die or become incapacitated, both parents believe it would be in the children's best interests to continue to be raised by the other parent.

86.     Absent a legal relationship with M.F.-B., there is no way for Chantelle Fisher-Borne to ensure that she would be legally permitted to continue to raise M.F.-B.

87.     Likewise, absent a legal relationship with E.F.-B., there is no way for Marcie Fisher-Borne to ensure that she would be legally permitted to continue to raise E.F.-B.

88.     Because of the uncertainty inherent in the status of a second parent in North Carolina, the Fisher-Bornes worry that if something were to happen to the other, either individuals or state actors might seek to challenge the second parent's parental status or guardianship.

89.     The granting of either of those petitions would prevent these plaintiffs from suffering the harms set out in this Complaint.

90.     A petition has been submitted for Marcie Fisher-Borne to be appointed guardian *ad litem* for M.F.-B. in this Action.

91.     In the event that the Court approves the petition, Marcie Fisher-Borne will appear in this Action in her capacity as guardian *ad litem* for M.F.-B.

92.     A petition has also been submitted for Chantelle Fisher-Borne to be appointed guardian *ad litem* for E.F.-B. in this Action.

93.     In the event that the Court approves the petition, Chantelle Fisher-Borne will appear in this Action in her capacity as guardian *ad litem* for E.F.-B.

### Terri Beck, Leslie Zanaglio, T.B.Z., and D.B.Z.

94.     Plaintiffs **Terri Beck** and **Leslie Zanaglio** are residents of Morrisville, North Carolina.  Their two sons, plaintiffs **T.B.Z.** and **D.B.Z.**, are biological brothers, ages ten and nine, respectively.

95.     Ms. Beck and Ms. Zanaglio have lived in a committed same-sex relationship for fifteen years.  Ms. Beck is 49 years old and is a staff recruiter at Duke University.  Ms. Zanaglio is 50 years old and is the director of operations at a benefits and investment consulting firm.

96.     Ms. Beck and Ms. Zanaglio began dating in their mid-thirties, and since the beginning of their relationship, they hoped one day to start a family of their own.  Ms. Beck and Ms. Zanaglio eventually decided to start a family by becoming foster parents, with the ultimate

-18-

goal of adopting children. Ms. Beck was particularly comfortable with the idea of fostering a child because she was raised by her grandparents, who cared for nineteen foster children over the course of her life.

97.     In July 2007, when they had already been together for more than 10 years, Ms. Beck and Ms. Zanaglio decided to move from Ohio to North Carolina, where they had frequently vacationed, with the goal of starting a family there. Ms. Beck and Ms. Zanaglio dedicated the following year to the preparations required to become foster parents.

98.     In order for Ms. Beck and Ms. Zanaglio's household to become certified as a foster home under North Carolina law, both women were required to undergo the same extensive training, education, and scrutiny.

99.     For basic foster parenting certification, Ms. Beck and Ms. Zanaglio attended 30 hours of parenthood training, spread out over many weeks and weekends. They also chose to take special classes on how to raise children with special needs, including children who had suffered significant abuse or neglect.

100.     In addition to attending classes and parenting workshops, both Ms. Beck and Ms. Zanaglio underwent extensive background checks, as well as several home inspections — including fire and safety inspections, social work inspections and interviews in conjunction with home visits from social workers — that evaluated the overall fitness of their home for foster children.

101.     Throughout this process, officials employed by DSS and the family services agency that was assisting their effort to become adoptive parents were fully aware that Ms. Beck and Ms. Zanaglio were in a committed relationship. Ms. Beck and Ms. Zanaglio were told by state officials that their sexual orientation would not be a negative factor in DSS's evaluation of

them and their home, and the women have no reason to suspect that their sexual orientation was considered adversely in DSS's decision to approve their household as a foster home, or each of them as foster parents.

102. Ms. Beck and Ms. Zanaglio were both approved and licensed as foster parents in 2008.

103. Ms. Beck and Ms. Zanaglio expressed a preference to foster and ultimately adopt siblings between the ages of four and eight years old.

104. In early 2009, Ms. Beck and Ms. Zanaglio received a call from their family services agency to advise them that there were two brothers with "special needs" in need of a foster family who might be a good match for their home. T.B.Z. and D.B.Z., then seven and six, respectively, had been in and out of foster care their whole lives, and had suffered significant physical and emotional abuse and neglect. After their biological father died in 2005, the boys' biological mother's parental rights were terminated, and the boys became available for a foster-to-adopt placement. Both boys had been diagnosed with post-traumatic stress disorder (PTSD).

105. After several months in which the boys and their mothers got to know each other, T.B.Z. and D.B.Z. moved into Ms. Beck's and Ms. Zanaglio's home on a full time basis in June 2009.

106. Before the adoption of the boys was finalized in July 2010, social workers visited the house at least monthly. In addition, Ms. Beck and Ms. Zanaglio made trips to the DSS to check in at least monthly, and they attended meetings with DSS employees to ensure that they were sufficiently sophisticated and trustworthy to manage the benefits that the brothers would continue to receive from the state.

107.     Creating and providing a family structure for two boys who previously had none has required a significant amount of time and energy from both Ms. Beck and Ms. Zanaglio. Ms. Beck and Ms. Zanaglio's commitment helped the brothers settle into the possibility of having found their "forever family."

108.     Ms. Beck and Ms. Zanaglio took numerous steps to make the transition a good one for their sons. They arranged for a behavior specialist to come to their home to work with the boys to treat severe PTSD, sometimes two or three days per week. D.B.Z. still attends therapy twice per week.

109.     The boys also require extra educational support. Both boys have received special tutoring and are now attending after-school care that provides them with a smaller adult-to-child ratio and greater individualized attention. Both the tutoring and the personalized after-school care have entailed considerable expense. Ms. Beck and Ms. Zanaglio have also invested countless hours helping their sons with homework and attending parent-teacher conferences more frequently than most parents.

110.     The boys have passed through normal and healthy phases of depression, anger, anxiety, and grief, while adjusting to the stability and love in their new home.

111.     Ms. Beck and Ms. Zanaglio have both been found by the state to be suitable parents for T.B.Z. and D.B.Z.

112.     Despite this fact, and despite the fact that Ms. Zanaglio and Ms. Beck underwent the same careful scrutiny in order to become certified as foster parents, only one of the mothers was permitted to legally adopt the boys as a matter of North Carolina law. Thus, while both Ms. Beck and Ms. Zanaglio have committed to share equally in all of their parental responsibilities for the rest of their lives, only Ms. Zanaglio is legally recognized as a parent to

the boys. Ms. Beck and Ms. Zanaglio chose Ms. Zanaglio to be the legally recognized parent because she was the higher wage earner and therefore had accumulated more savings, which they believed would increase the probability that the adoption would be granted.

113. Since being placed in Ms. Beck and Ms. Zanaglio's home, T.B.Z. and D.B.Z. have thrived in the stable, nurturing, and loving environment that their parents and their loving extended families provide. The boys are in good physical health, and are performing better in school since coming to live with Ms. Beck and Ms. Zanaglio.

114. Ms. Beck and Ms. Zanaglio's home and their family serves the best interests of T.B.Z. and D.B.Z..

115. The boys consider both Ms. Beck and Ms. Zanaglio to be their equal parents. When both women are within earshot, the boys call Ms. Beck "Mama T" and they call Ms. Zanaglio "Mama Leslie"; when there is no chance of confusion, the boys simply refer to either woman as "Mom."

116. Ms. Beck and Ms. Zanaglio have not yet tried to explain to their children the different legal statuses that their mothers hold or the effect of those different statuses and the harms they cause.

117. Ms. Beck and Ms. Zanaglio both believe that when the boys are old enough to understand that their bonds with Ms. Beck are less legally secure, they will experience anxiety about the possibility of losing yet another parent.

118. Although Ms. Beck and Ms. Zanaglio have undertaken efforts to ensure that each will be able to continue life with minimum legal disruption if the other were to die or become incapacitated, and to avoid the harms that the statutory adoption scheme causes to their family, such steps cannot give their family the full protection of legal parentage.

119.     Under North Carolina's adoption statutes, in order for Ms. Beck to become a legal parent to her boys through adoption, Ms. Zanaglio would be required to sign away and terminate all of her own parental rights.  Thus, North Carolina law bars both mothers from simultaneously being recognized as legal parents to their children.

120.     Nonetheless, if Ms. Beck were ever permitted to file a petition for a second parent adoption of T.B.Z. and D.B.Z., and were that petition to be considered pursuant to other existing law and regulation, on information and belief, such a petition would be granted as in the children's best interests.  In fact, because both Ms. Beck and Ms. Zanaglio already have been determined by the state to be suitable parents for their children, such an outcome is virtually certain.

121.     If Ms. Zanaglio were to die or become incapacitated, both Ms. Zanaglio and Ms. Beck believe it would be in the children's best interests for Ms. Beck to continue raising the children as their parent.

122.     Absent a legal relationship with T.B.Z. and D.B.Z., there is no way for Ms. Beck to ensure that she would be legally permitted to do so.

123.     If Ms. Zanaglio did pass away, the boys would have no legal parent for an undetermined period of time.

124.     During the time that Ms. Beck and Ms. Zanaglio were fostering T.B.Z. and D.B.Z., their household received a foster care subsidy from the state.  Ms. Zanaglio continues to receive an adoption subsidy as the boys' legal parent.

125.     Both the foster care subsidy and the adoption subsidy exist to encourage and support families that provide homes to children in need.

126. Ms. Beck and Ms. Zanaglio rely on the subsidy in parenting T.B.Z. and D.B.Z. and worry that if something were to happen to Ms. Zanaglio, the subsidy would not continue and the children would be additionally harmed by the deprivation of an important benefit to which they are otherwise entitled under North Carolina law.

127. The granting of the petition would prevent these plaintiffs from suffering the harms set out in this Complaint.

128. A petition has been submitted for Ms. Zanaglio to be appointed guardian *ad litem* for T.B.Z. and D.B.Z. in this Action.

129. In the event that the Court approves the petition, Ms. Zanaglio will appear in this Action in her capacity as guardian *ad litem* for T.B.Z. and D.B.Z.

### Shana Carignan, Megan Parker, and J.C.

130. Plaintiff **Shana Carignan** is a lifelong native of North Carolina from Greensboro. Plaintiff **Megan Parker** is a lifelong native of North Carolina from Blowing Rock. Their son, plaintiff **J.C.**, who they adopted from foster care in 2011, is four years old.

131. Ms. Carignan and Ms. Parker have lived together in Greensboro in a committed same-sex relationship for four years. Ms. Carignan is 29 years old and is a development associate for a local nonprofit that supports individuals with HIV and AIDS. Ms. Parker is 33 years old and is a full-time Alternative Family Living provider. In that capacity, she provides care in her own home to an adult member of the community who was formerly institutionalized and who has serious cognitive and physical disabilities. She has worked in this field for over ten years.

132. Ms. Carignan and Ms. Parker always knew they wanted children, and Ms. Parker's work providing care for disabled individuals inspired the couple to adopt a child with special needs.

133. In order for Ms. Carignan and Ms. Parker's household to become certified as a foster home in North Carolina, both mothers were required to undergo equally extensive training, education, and scrutiny.

134. To comply with North Carolina's foster parenting certification requirements, Ms. Carignan and Ms. Parker each attended 30 hours of parenthood training. In addition to attending classes and parenting workshops, both Ms. Carignan and Ms. Parker submitted to extensive background checks, and a number of home inspections — including fire and safety inspections, social work inspections and interviews in conjunction with home visits from social workers — to evaluate the overall fitness of their home for adoptive children.

135. Throughout this process, officials employed by the family services agency that was assisting Ms. Carignan and Ms. Parker's efforts to become adoptive parents were all fully aware that Ms. Carignan and Ms. Parker were in a committed, same-sex relationship.

136. Once Ms. Carignan and Ms. Parker were both approved and licensed as foster parents, they reviewed the files of young children with special needs who needed a placement, and identified J.C. as one such child. They were referred to J.C. through a placement agency in North Carolina that matches children anywhere in the country with parents in North Carolina who are willing to adopt a child with special needs. J.C. became available for adoption at a group facility in Texas.

137. J.C. was born in Texas in 2007. He has cerebral palsy that is exacerbated by the poor care he received following his birth. His biological mother had untreated health problems and substance abuse problems that may have contributed to his medical condition. At birth, J.C. was placed with a relative, but the relative was unable to provide J.C. with the specialized care that he needed. At a check-up several months after his birth, J.C. weighed less than he had

weighed at birth. Soon thereafter, he was taken into the care of the State of Texas, and his parents' rights were terminated.

138. Ms. Carignan and Ms. Parker first expressed interest in adopting J.C. in April of 2009. The family was approved for the adoption by the State of Texas in or about October of 2009. In January of 2010, both Ms. Carignan and Ms. Parker flew to Texas to meet J.C. in person for the first time, and in March of 2010, Ms. Parker flew to Texas to bring J.C. to their home in Greensboro. From that point forward, J.C. was placed in Ms. Carignan and Ms. Parker's home as a foster child, in a foster-to-adopt capacity, and the adoption of J.C. was finalized approximately one year later.[2]

139. At the time of J.C.'s placement, he was evaluated to be severely developmentally disabled. At the age of two, he had the mental capacity of a four-month-old, but since arriving in Ms. Carignan and Ms. Parker's home, he has flourished beyond all expectations. While J.C.'s physical disability means that he cannot walk and has limited ability to control his limbs or communicate verbally, he has started to communicate using "eye gaze" communication, and he understands a great deal of what he hears. When he was first placed in Ms. Carignan and Ms. Parker's home, J.C. attended an infant/toddler educational program, but he has now progressed to pre-school at a special education school, and Ms. Carignan and Ms. Parker believe he will be able to attend public school for kindergarten, as a special needs student.

140. Ms. Carignan and Ms. Parker both have been found by the state to be suitable parents for J.C.

141. However, when the time came for J.C. to be legally adopted, only one of the mothers was permitted to do so under North Carolina law. Therefore, despite the fact that both

---

[2]    J.C.'s adoption decree erroneously reads that he was adopted on April 24, 2011. The correct date is March 24, 2011.

Ms. Carignan and Ms. Parker underwent careful scrutiny in order to become certified as foster parents, and both have committed to share equally in all of their parental responsibilities for the rest of their lives, only Ms. Parker is legally recognized as a parent to their son.

142.     The mothers selected Ms. Parker as the legal parent because her full-time occupation involved caring for individuals with cerebral palsy.  They chose to give J.C. Ms. Carignan's last name as a permanent symbol of her role and significance as his second parent.

143.     Since being placed in Ms. Carignan and Ms. Parker's home, J.C. has thrived in the stable, nurturing, and loving environment that his parents provide.

144.     Ms. Carignan and Ms. Parker have provided the only supportive and healthy home that J.C. has ever known.  J.C. is also loved and embraced by Ms. Carignan and Ms. Parker's families.  Ms. Carignan and Ms. Parker's families all consider J.C. to be part of the family.

145.     Their loving, supportive, and healthy family serves the best interests of J.C.

146.     Under North Carolina's adoption statutes, in order for Ms. Carignan to adopt J.C., Ms. Parker would have to sign away her own parental rights.  Thus, North Carolina law bars both mothers from simultaneously being recognized as legal parents to their son.

147.     Nonetheless, if Ms. Carignan were able to file a petition for a second parent adoption of J.C., and were that petition to be considered pursuant to other existing law and regulation, on information and belief, such a petition would be granted as in the child's best interests.  In fact, because both Ms. Carignan and Ms. Parker already have been determined by the state to be suitable parents for their son, such an outcome is virtually certain.

148.    If Ms. Parker were to die or become incapacitated, Ms. Carignan and Ms. Parker believe it would be in J.C.'s best interests for Ms. Carignan to continue to raise J.C. as his parent.

149.    Absent a legal parent-child relationship with J.C., there is no way to ensure that Ms. Carignan would be legally permitted to do so.

150.    In light of J.C.'s extensive (and often urgent) special needs, Ms. Carignan and Ms. Parker worry that at any particular moment when J.C. might require medical attention, the state or its agents might deny Ms. Carignan the right to make decisions for J.C.

151.    Ms. Carignan and Ms. Parker's worries about being denied the opportunity to remain with J.C. and make decisions for him are based on their actual, traumatic experiences.  In the summer of 2010, J.C. required a surgical procedure at UNC-Chapel Hill to correct a digestive problem that caused him to vomit constantly.  Because Ms. Carignan has no legal parental relationship to J.C., the hospital staff did not permit her to stay past public visiting hours.  As a result, in order to properly care for J.C. and provide him with a family presence at all times, Ms. Parker was forced to remain at the hospital around-the-clock, without the respite or support from Ms. Carignan, J.C.'s other parent.  Likewise, Ms. Carignan was forced to spend evenings worrying about her son and her partner.  Both mothers were distraught about their inability to remain together as a family at a time when their son needed them most.

152.    Ms. Carignan and Ms. Parker also worry that if something were to happen to Ms. Parker, the benefits J.C. receives for his medical needs might be interrupted.  Ms. Parker receives $545 per month from the State of Texas pursuant to an adoption subsidy agreement, which supports J.C.'s adoption as a special needs placement.  J.C. also receives full Medicaid health insurance benefits from the State of North Carolina.  Finally, Ms. Parker receives

approximately $155 per month in Social Security Insurance payments for J.C. from the State of North Carolina.

153.    The granting of the petition would prevent these plaintiffs from suffering the harms set out in this Complaint.

154.    A petition has been submitted for Ms. Parker to be appointed guardian *ad litem* for J.C. in this Action.

155.    In the event that the Court approves the petition, Ms. Parker will appear in this Action in her capacity as guardian *ad litem* for J.C.

### Leigh Smith, Crystal Hendrix, and J.H.-S.

156.    Plaintiffs **Leigh Smith** and **Crystal Hendrix** are residents of Asheville, North Carolina.  Their family includes plaintiff **J.H.-S.**, who is seven months old.

157.    Ms. Smith and Ms. Hendrix have been a committed couple for seven-and-one-half years and consider themselves life partners.  Both women are lifelong North Carolinians.

158.    Ms. Smith is 40 years old and grew up in Greensboro; she currently cares for J.H.-S. at home full-time, although she was previously a kindergarten teacher and she hopes someday to return to that profession.  Ms. Hendrix is 38 and from western North Carolina; she is currently an elementary school librarian.

159.    Ms. Smith and Ms. Hendrix are both passionate educators and have worked on a daily basis with children.  They always wanted children of their own.  The couple decided that Ms. Hendrix should be the biological mother of J.H.-S.

160.    Ms. Smith was involved in all aspects of conceiving J.H.-S.  Ms. Smith attended almost every insemination attempt and prenatal appointment, and was present to view ultrasound pictures, and Ms. Smith and Ms. Hendrix chose J.H.-S's name together.  Ms. Smith was present during labor and stood by Ms. Hendrix's side during childbirth.

-29-

161.     In all respects, J.H.-S. is developing mentally and physically as a healthy, well-adjusted child.

162.     Despite the fact that both Ms. Smith and Ms. Hendrix participate equally in all aspects of raising J.H.-S., under North Carolina law, only Ms. Hendrix is recognized as his legal parent.

163.     Under North Carolina's adoption statutes, in order for Ms. Smith to adopt J.H.-S., Ms. Hendrix would have to sign away her own parental rights.  Thus, North Carolina law bars both mothers from simultaneously being legal parents to their child.

164.     Nonetheless, if Ms. Smith were ever able to file a petition for a second parent adoption of J.H.-S., and were that petition to be considered pursuant to other existing law and regulation, on information and belief, such a petition would be granted as in the child's best interests.

165.     Ms. Smith and Ms. Hendrix have not yet tried to explain to J.H.-S. the different legal statuses that his mothers hold or the effect of those different statuses and the harms they cause.

166.     Ms. Smith and Ms. Hendrix both believe that once J.H.-S. is old enough to understand that his bonds with Ms. Smith are less legally secure, he will experience anxiety and feelings of insecurity about the stability of his family.

167.     Although Ms. Smith and Ms. Hendrix have undertaken efforts to ensure that each will be able to continue life with minimum legal disruption if the other were to die or become incapacitated, and to avoid the harms that the statutory adoption scheme causes to their family, such steps cannot give their family the full protection of legal parentage.

168.    If Ms. Hendrix were to die or become incapacitated, Ms. Smith and Ms. Hendrix believe that it would be in J.H.-S.'s best interests for Ms. Smith to continue to raise him as his parent.

169.    Absent a legal parent-child relationship with J.H.-S., there is no way to ensure that Ms. Smith would be legally permitted to do so.

170.    Because of the uncertain legal relationship between Ms. Smith and J.H.-S., both mothers worry that if something were to happen to Ms. Hendrix, Ms. Smith's relationship with J.H.-S. could be jeopardized by legal challenges to her parentage, either by the state or by Ms. Hendrix's family.

171.    Ms. Hendrix's parents do not accept Ms. Smith, and do not recognize her as J.H.-S's second parent.  As a result, both Ms. Smith and Ms. Hendrix are concerned that if Ms. Hendrix were to die or become incapacitated, her parents would attempt to interfere with Ms. Smith's custody of J.H.-S.

172.    The granting of the petition would prevent these plaintiffs from suffering the harms set out in this Complaint.

173.    A petition has been submitted for Ms. Hendrix to be appointed guardian *ad litem* for J.H.-S. in this Action.

174.    In the event that the Court approves the petition, Ms. Hendrix will appear in this Action in her capacity as guardian *ad litem* for J.H.-S.

### Dana Draa, Lee Knight Caffery, M.M.C.-D., and M.L.C.-D.

175.    Plaintiffs **Ms. Dana Draa** and **Lee Knight Caffery** are residents of Charlotte, North Carolina.  They have two children:  plaintiffs **M.M.C.-D.** and **M.L.C.-D.**, who are three-and-a-half years old and eighteen months old, respectively.

176. Ms. Draa and Ms. Caffrey have been a committed couple for six years, and had a formal commitment ceremony in 2007.

177. Ms. Draa is 41 years old and currently works for the Veterans Administration assisting blind and visually impaired veterans. Ms. Draa is herself a veteran of the United States Navy; she spent eight months in the Middle East as part of Operation Desert Storm during the Gulf War, and served in the Alaska National Guard. Ms. Caffrey is 36 years old and is an attorney.

178. Ms. Draa and Ms. Caffrey both always wanted children of their own, and initially discussed whether to adopt children or have their own biological children. They decided together that Ms. Caffrey would be the birth mother of their children.

179. Ms. Draa was involved in all aspects of conceiving their children. Ms. Draa attended almost every insemination attempt and prenatal appointment, and the couple chose the children's names together. Ms. Draa was present during labor and stood by Ms. Caffrey's side during the birth of both children.

180. In all respects, both children are developing mentally and physically as healthy, well-adjusted children.

181. Ms. Draa and Ms. Caffrey have provided the only home that M.M.C.-D. and M.L.C.-D. have ever known. Both M.M.C.-D. and M.L.C.-D. call Ms. Draa "Mama D" or "Ma D," and calls Ms. Caffrey "Mom" or "Mum." The children have hyphenated last names to, among other reasons, decrease the likelihood that strangers who are unfamiliar with their family situation will challenge Ms. Draa's rights as a parent.

182. Their loving, supportive, and healthy family serves the best interests of M.M.C.-D. and M.L.C.-D.

183.     Despite the fact that both Ms. Draa and Ms. Caffrey participate equally in all aspects of raising their children, under North Carolina law, only Ms. Caffrey is recognized as a legal parent to M.M.C.-D. and M.L.C.-D.

184.     Under North Carolina's adoption statutes, Ms. Draa could only adopt M.M.C.-D. and M.L.C.-D. if Ms. Caffrey signed away her own parental rights.  Thus, North Carolina law bars both mothers from simultaneously being recognized as legal parents to their children.

185.     Nonetheless, if Ms. Draa were able to file a petition for a second parent adoption of M.M.C.-D. and M.L.C.-D., and were that petition to be considered on the merits and evaluated pursuant to law and regulation, such a petition would be granted as in the children's best interests.

186.     Ms. Draa and Ms. Caffrey have not yet tried to explain to their children the different legal statuses that their mothers hold or the effect of those different statuses and the harms they cause.

187.      Ms. Draa and Ms. Caffrey both believe that when the children understand that their bonds with Ms. Draa are less legally secure, they will experience anxiety and feelings of insecurity about the stability of their family.

188.     Although Ms. Draa and Ms. Caffrey have undertaken efforts to ensure that each will be able to continue life with minimum legal disruption if the other were to die or become incapacitated, and to avoid the harms that the statutory adoption scheme causes to their family, such steps cannot give their family the full protection of legal parentage.

189.     Because of the uncertainty inherent in the status of a second parent in North Carolina, Ms. Draa and Ms. Caffrey live with constant anxiety about what would happen to the boys if Ms. Caffrey were to die or become incapacitated.

190.    If Ms. Caffrey were to die or become incapacitated, both Ms. Draa and

Ms. Caffrey believe that it would be in the children's best interests for Ms. Draa to continue to

raise the children as their parent.

191.    Absent a legal parent-child relationship between Ms. Draa and the children, there

is no way to ensure that she would be legally permitted to do so.

192.    Because of the uncertainty inherent in the status of Second Parents in North

Carolina, both mothers worry that if something were to happen to Ms. Caffrey, there is the real

possibility that Ms. Draa's parental status or guardianship might be challenged.

193.    The granting of the petition would prevent these plaintiffs from suffering the

harms set out in this Complaint.

194.    A petition has been submitted for Ms. Caffrey to be appointed guardian *ad litem*

for M.M.C.-D. and M.L.C.-D. in this Action.

195.    In the event that the Court approves the petition, Ms. Caffrey will appear in this

Action in her capacity as guardian *ad litem* for M.M.C.-D. and M.L.C.-D.

### Shawn Long, Craig Johnson, and I.J.-L.

196.    Plaintiffs **Craig Johnson** and **Shawn Long** are native North Carolinians from

Garner and Bushy Fork, respectively, and they currently reside in Wake Forest.  Their son,

plaintiff **I.J.-L.,** is ten years old.

197.    Mr. Johnson and Mr. Long have been in a committed same-sex relationship for

eighteen years.  Mr. Johnson is 45 years old and is a clinical program assistant at a

pharmaceutical company.  Mr. Long is 42 years old and is an administrative coordinator at a

non-profit organization.

198.     When Mr. Johnson and Mr. Long decided to start a family, they wanted to give a loving home to an older child and chose to pursue adoption through the foster care system. They chose Mr. Johnson to be the adoptive parent because he had parents and extended family nearby.

199.     I.J.-L.'s mother gave birth to him at age sixteen. I.J.-L. was placed in temporary foster care at an early age, and when he was returned to his mother's home, his grandmother was responsible for his care. After further neglect, I.J.-L. was hospitalized for malnutrition and placed into a therapeutic foster home. He was four years old at the time.

200.     By the time I.J.-L. joined Mr. Johnson and Mr. Long's family at five years old, he had already experienced severe trauma due to neglect and abuse.

201.     In order for Mr. Johnson and Mr. Long's household to become certified as a foster home under North Carolina law, both men were required to undergo the same extensive training, education, and scrutiny.

202.     For basic foster parenting certification, Mr. Johnson and Mr. Long attended approximately 30 hours of parenthood training, spread out over many weeks and weekends.

203.     In addition to attending classes and parenting workshops, both Mr. Johnson and Mr. Long underwent extensive background checks, as well as several home inspections — including fire and safety inspections, social work inspections, and interviews in conjunction with home visits from social workers — that evaluated the overall fitness of their home for foster children.

204.     Throughout this process, officials employed by DSS and the family services agency that was assisting their effort to become adoptive parents were fully aware that Mr. Johnson and Mr. Long were in a committed relationship.

205. Mr. Johnson and Mr. Long were both approved and licensed as foster parents in 2006.

206. Mr. Johnson and Mr. Long expressed a preference to foster and ultimately adopt a child who was older than an infant, and up to ten years old.

207. I.J.-L. was placed with Mr. Johnson and Mr. Long in 2007.

208. Mr. Johnson and Mr. Long have both been found by the state to be suitable parents for I.J.-L.

209. Despite this fact, and despite the fact that Mr. Johnson and Mr. Long underwent the same careful scrutiny in order to become certified as foster parents, only one of the fathers was permitted to legally adopt I.J.-L. as a matter of North Carolina law. Thus, while both Mr. Johnson and Mr. Long have committed to share equally in all of their parental responsibilities for the rest of their lives, only Mr. Johnson adopted I.J.-L. in 2008, and only he is legally recognized as a parent to I.J.-L.

210. Since being placed in Mr. Johnson and Mr. Long's home, I.J.-L. has thrived in the stable, nurturing, and loving environment that his parents and his loving extended families provide. I.J.-L. is in better physical health and performs better in school since coming to live with Mr. Johnson and Mr. Long.

211. Mr. Johnson and Mr. Long's home and their family serves the best interests of their child.

212. I.J.-L. considers both Mr. Johnson and Mr. Long to be his equal parents. He calls Mr. Johnson "Dad" and Mr. Long "Pa."

213. Under North Carolina's adoption statutes, in order for Mr. Long to become a legal parent to I.J.-L. through adoption, Mr. Johnson would be required to sign away and terminate all

of his own parental rights. Thus, North Carolina law bars both fathers from simultaneously being recognized as legal parents to I.J.-L.

214. Mr. Johnson and Mr. Long both worry that when I.J.-L. understands that his bond with Mr. Long is less legally secure, he will experience anxiety about the possibility of losing yet another parent.

215. Nonetheless, if Mr. Long were ever permitted to file a petition for a second parent adoption of I.J.-L., and were that petition to be considered on the merits and evaluated pursuant to other existing law and regulation, on information and belief, such a petition would be granted as in the child's best interests. In fact, because both Mr. Long and Mr. Johnson already have been determined by the state to be suitable parents for I.J.-L., such an outcome is virtually certain.

216. If Mr. Johnson were to die or become incapacitated, both Mr. Johnson and Mr. Long believe it is in I.J.-L's best interests for Mr. Long to continue raising the boy as his parent.

217. Absent a legal relationship with I.J.-L., there is no way for Mr. Long to ensure that he would be legally permitted to do so.

218. Both men therefore live with constant anxiety about what would happen to I.J.-L. if Mr. Johnson were to die or become incapacitated.

219. Mr. Long and Mr. Johnson also worry that if I.J.-L. were to get injured at school or sports practice and need urgent medical care, Mr. Long would not be allowed to make medical decisions for his son.

220. If Mr. Johnson did pass away, I.J.-L. would have no legal parent for an undetermined period of time.

221.     During the time that Mr. Johnson and Mr. Long were fostering I.J.-L., their household received a foster care subsidy from the state.  Mr. Johnson continues to receive an adoption subsidy as the boy's legal parent.

222.     On information and belief, Mr. Long would not be allowed to collect the adoption subsidy unless he could become I.J.-L.'s legal parent.

223.     Both the foster care subsidy and the adoption subsidy exist to encourage and support families that provide homes to children in need.

224.     Mr. Johnson and Mr. Long rely on the subsidy in parenting I.J.-L., and worry that if something were to happen to Mr. Johnson, the subsidy would not continue and their son would be harmed by the additional deprivation of an important benefit to which he is otherwise entitled under North Carolina law.

225.     The granting of the petition would prevent these plaintiffs from suffering the harms set out in this Complaint.

226.     A petition has been submitted for Mr. Johnson to be appointed guardian *ad litem* for I.J.-L. in this Action.

227.     In the event that the Court approves the petition, Mr. Johnson will appear in this Action in his capacity as guardian *ad litem* for I.J.-L.

* * *

228.     As a group, Marcie and Chantelle Fisher-Borne, Terry Beck, Shana Carignan, Leigh Smith, Dana Draa and Shawn Long are all referred to collectively as the "Second Parent Plaintiffs."

229.     As a group, Marcie and Chantelle Fisher-Borne, Leslie Zanaglio, Megan Parker, Crystal Hendrix, Lee Knight Caffery and Craig Johnson are all referred to collectively as the "Legal Parent Plaintiffs."

230. As a group, M.F.-B., E.F.-B., T.B.Z., D.B.Z., J.C., J.H.-S., M.M.C.-D., M.L.C.-D. and I.J.-L. are all referred to collectively as the "Child Plaintiffs."

## HARMS SUFFERED BY PLAINTIFFS AS A RESULT OF
## NORTH CAROLINA'S CATEGORICAL PROHIBITION
## AGAINST SECOND PARENT ADOPTION

231. Legal recognition of a parent-child relationship gives rise to numerous benefits for both the child and the parent that are not available otherwise.

232. Legal recognition of the parent-child relationship provides rights, benefits, privileges and entitlements that may come from federal, state, local, or private sources.

233. Legal recognition also increases the strength and stability of the parent-child bond and enhances the security of the relationship.

234. Legal recognition of the parent-child bond strengthens the whole family.

235. Legal recognition of the parent-child bond ensures that the child and surviving parent will remain together even in the event of death or incapacity of one legal parent, or in the unlikely event that a child's two parents separate.

236. Plaintiffs' families are harmed and made less secure by North Carolina's prohibition on second parent adoption, and they suffer injury as a result of being deprived of protections they otherwise would receive but for North Carolina's prohibition.

237. The Child Plaintiffs suffer direct and immediate harm as a result of defendants' categorical rejection of any petition for second parent adoption and are denied many public and private rights and privileges that flow from a legally recognized parent-child relationship, including the benefits set out below.

238. For example, under North Carolina law, only a legal parent can consent to medical treatment for a minor child. *See* N.C. Gen. Stat. § 90-21.1. Even when a Second Parent Plaintiff holds a power of attorney permitting him or her to make decisions on behalf of the

Legal Parent Plaintiff, a medical care provider could rely on the plain language of N.C. Gen. Stat. § 90-21.1 and either refuse to permit that second parent from making important medical decisions concerning one of the Child Plaintiffs, or refuse to permit a Second Parent Plaintiff from remaining with one of the Child Plaintiffs during a medical procedure or medical emergency — a time when the child needs his or her parents most.

239.     Serious harm to a child can result at any moment if one of his or her parents and caretakers is unable to give instructions to health care providers or consent to emergency medical treatment.

240.     The potential for immediate harm is especially acute for plaintiff J.C. who suffers from a complicated and chronic medical condition.  As the incident described in paragraph 151 makes clear, J.C.'s second parent has been denied the ability to remain with her son in the past, and there exists a concrete and real probability that this may occur again in the future.

241.     In addition, through the federal Social Security Insurance program, upon the death of a qualifying wage-earner, a surviving spouse and/or dependent legal child or children can collect survivor benefits that generally equal between 150% and 180% of the deceased family member's Social Security benefit amounts.

242.     Survivor benefits under the Social Security program are available to legal spouses and children, or other dependents with a legally formalized relationship to the decedent.  They are not available between family members like those here, who do not have a formal legal relationship between one of the parents and his or her child.

243.     Under the Social Security Insurance program, Child Plaintiffs are currently unable to collect survivor benefits, and other federal government benefits that are available to legal children whose parents become disabled or retire, from their second parents.

244.	Under North Carolina law, children of an injured employee may claim the parent-employee's compensation payments in the event of that parent's death.  *See* N.C. Gen. Stat. § 97-39.  North Carolina defines "child" to include "a child legally adopted prior to the injury of the employee." *Id.*

245.	Because the Child Plaintiffs cannot be adopted by their second parents, the Child Plaintiffs would be ineligible to collect these worker compensation benefits if their second parent dies.

246.	Under North Carolina intestacy law, the property of a deceased parent passes to biological children or adopted children.  *See* N.C. Gen. Stat. §§ 29-16, 29-17.  North Carolina intestacy law makes no provision for property to pass from a deceased parent to a non-legal child.

247.	Because the Child Plaintiffs cannot be adopted by their second parents, the Second Parent's property would not pass to the Child Plaintiffs if their second parent dies intestate or has his or her will declared invalid.

248.	This problem is magnified because intestacy laws affect inheritances on a spectrum of relatives, including grandparents, aunts and uncles.  The Child Plaintiffs are also therefore ineligible to inherit, through intestacy law, from grandparents and other relatives of their second parents.

249.	Similarly, a Child Plaintiff would be ineligible to be beneficiaries of trusts put in place by parents of his or her second parent (i.e., non-legal grandparents) or other family members of the second parent who died before ever knowing that the Child Plaintiff would become part of their family through the Second Parent Plaintiff, if the writings governing those

trusts conferred benefits upon "issue," "grandchildren," or were not otherwise specifically drafted to contemplate a bequest to Child Plaintiffs.

250.     Under North Carolina law, damages from an action brought for wrongful death flow to a decedent's estate and are distributed to the beneficiaries of that estate.  *See* N.C. Gen. Stat. §§ 28A-18-2.  Because the Child Plaintiffs cannot be adopted by their second parents, should a wrongful death action be brought by the estate of the second parent, the Child Plaintiffs would not be deemed beneficiaries of any damages from such action.

251.     The State of North Carolina provides an adoption subsidy to support parents who adopt children from foster care.  Other states provide similar incentives to encourage adoption, in part because adoption provides such significant financial savings to the state over congregate care, and because of a policy determination that permanent placements with families are better for children than remaining in the custody of the state.

252.     Among those families with children who were adopted out of state foster care, if the Legal Parent Plaintiff were to die or become incapacitated, in addition to losing that parent's wage income, the Child Plaintiffs, specifically J.C., T.B.Z., D.B.Z. and I.J.-L., would lose the financial support through the adoption subsidy.

253.     For those harms described in paragraphs 238 through 252 that depend on future events, there is no action that the plaintiffs can take to cure (or even mitigate) those harms once those future events have occurred.  These harms would then be immediate and irremediable.

254.     For example, some of the harms described in paragraphs 238 through 252 are precipitated by the death of the Second Parent Plaintiff.  Once dead, a Second Parent Plaintiff will never be able to formalize a legal parent-child relationship with the Child Plaintiff through second parent adoption or otherwise.  Thus, any benefits to which a Child Plaintiff would have

been entitled had the Child Plaintiff been legally adopted by his or her second parent will be irretrievably lost to the Child Plaintiff at the moment of the Second Parent Plaintiff's death.

255.    In addition to being deprived of rights and benefits, the plaintiff families also suffer emotional harm and fear as a result of North Carolina's ban on second parent adoption.

256.    Once the Child Plaintiffs are old enough to understand that they do not have a legal relationship with one parent, upon information and belief, they will suffer anxiety from the uncertainty that accompanies that lack of legal relationship.

257.    For example, when the Child Plaintiffs are old enough to understand the differences in the legal statuses of their parents, the Child Plaintiffs will face uncertainty regarding where they will live, or with whom they will live, should their legal parent die or become incapacitated.  The anxiety that the Child Plaintiffs will suffer as a result of the lack of legal relationship with both their parents will be especially aggravated for the Child Plaintiffs who have already suffered displacement and relocation from their biological families.

258.    As a result of the deprivations described in this Action, the Parent Plaintiffs forego opportunities and experiences for the Child Plaintiffs that their families would otherwise consider, including limiting their travel to geographic regions that will recognize the legitimacy of their family relationship, limiting their schooling options to those schools that respect their family structure, limiting their choice of medical care providers to those that would respect the rights of the Second Parent, and being forced to carry copies of many (potentially legally insufficient) legal documents whenever traveling.

259.    Both Legal and Second Parent Plaintiffs face currently present and continuing psychological suffering and injury, including acute anxiety and worry, because they know that if the Legal Parent were to die or become incapacitated, the ability of Second Parent to continue

caring for the child would be subject to challenge precisely at the time when the child or children would be most vulnerable and emotionally fragile, and most in need of continuing stability in their domestic life.

260. The harms to the Second Parent Plaintiffs range from the mundane — being unable to consent to school activities for their children — to the life threatening — being unable to consent to medical treatment, to the emotional — feeling that their parental role is less legitimate because it is not legally recognized by the state.

261. Conversely, the Legal Parent Plaintiffs are harmed by having all legal responsibility fall on their shoulders, and they are deprived of the joy of sharing legal parentage with their partner and co-parent. They share in all aspects of raising their children with the Second Parent Plaintiffs, but in the eyes of the law, only the Legal Parent Plaintiffs are responsible for decision-making and support of the children.

262. The Legal Parent Plaintiffs would like to share legal responsibility for their children with the Second Parent Plaintiffs, and know it is in the best interest of their children to do so. By categorically prohibiting the Second Parent Plaintiffs from formalizing their relationships with the Child Plaintiff, North Carolina prevents the Legal and Second Parent Plaintiffs from fully asserting parental authority and responsibility to act in the best interests of their children.

263. To the extent any of the harms set forth in this Complaint can be ameliorated by taking other steps and means that need not be taken by stepparents who can petition to adopt, such steps and means are more costly and do not cure the harms set forth in this Complaint.

264. For example, in order to protect their children, some Legal and Second Parent Plaintiffs have spent thousands of dollars on attorneys' fees to pay for the creation of legal

documents that attempt to bring legal security to some aspects of the parent-child relationship between the Second Parent Plaintiffs and the Child Plaintiffs.  These documents, however, do not and cannot create legal parentage.

265.    Similarly, the Legal and Second Parent Plaintiffs have spent hundreds of hours of their own time navigating the legal, administrative, and personal hurdles that are created by the lack of legal recognition for the Second Parent Plaintiffs, and managing the process of creating and defending inferior legal structures to protect their families' rights and privileges.

266.    The effects of the harms set out above are current and real, as they affect planning, budgets and other current and real financial decisions.  Such denials also cause current psychological and emotional harm that would not arise but for North Carolina law.

## **DEFENDANTS**

267.    Defendant John W. Smith is the Director of the North Carolina Administrative Office of the Courts ("AOC"), which, on information and belief, has the responsibility for promulgating rules, policies and procedures to control or advise North Carolina clerks of county courts who apply the North Carolina adoption laws when considering whether to accept or reject petitions for adoption.

268.    In particular, the AOC has the responsibility and authority to instruct the Clerks of the Superior Court in the 100 counties of North Carolina regarding proper and lawful application of North Carolina law.

269.    He and his successors are sued in their official capacity only.

270.    Defendant David L. Churchill is the Clerk of the Superior Court for Guilford County.  In that capacity, he is entrusted with the authority to carry out certain laws of the state, including the adoption statutes described herein.

271.     Specifically, he presides over adoption proceedings in Guilford County, adjudicating individual petitions for adoption and ultimately deciding whether any particular adoption is in the best interests of the child.

272.     He and his successors are sued in their official capacity only.

273.     Defendant Archie L. Smith is the Clerk of the Superior Court for Durham County, North Carolina.  In that capacity, he is entrusted with the authority to carry out certain laws of the state, including the adoption statutes described herein.

274.     Specifically, he presides over adoption proceedings in Durham County, adjudicating individual petitions for adoption and ultimately deciding whether any particular adoption is in the best interests of the child.

275.     He and his successors are sued in their official capacity only.

276.     Defendants' actions constitute actions under color of law.

## FUTILITY

277.     The Second Parent Plaintiffs are categorically excluded from consideration for a second parent adoption by the laws of North Carolina.

278.     Under North Carolina law, as definitively interpreted by the North Carolina Supreme Court, the courts of North Carolina have no jurisdiction to hear such a petition for a second parent adoption.  *See Boseman* v. *Jarrell*, 704 S.E.2d 494, 501 (N.C. 2010).

279.     Defendants David L. Churchill, Archie L. Smith and other Clerks of the Superior Court are required to follow the laws of the State of North Carolina as definitively interpreted by the North Carolina Supreme Court.

280.     A Clerk of the Superior Court following North Carolina law necessarily would reject any petition for a second parent adoption filed by any of the Second Parent Plaintiffs in this case.

281. The Legal and Second Parent Plaintiffs in this case have not yet sought a second parent adoption for their children, the Child Plaintiffs in this case.

282. The Second Parent Plaintiffs, together with the Legal Parent Plaintiffs, intend to seek, and would seek, a second parent adoption, were such adoptions available.

283. Because the laws of the State of North Carolina, as definitively interpreted by the North Carolina Supreme Court, categorically prohibit second parent adoption under the circumstances described above, it would be futile for the Second Parent Plaintiffs to seek a second parent adoption.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(BY THE CHILD PLAINTIFFS)**
**(CHILDREN'S RIGHTS UNDER THE EQUAL PROTECTION CLAUSE
OF THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983)**

284. Plaintiffs repeat and reallege paragraphs 1 to 283 as if set forth in full.

285. North Carolina's categorical refusal to permit applications for second parent adoption petitions by same-sex couples and evaluate those petitions in accordance with other existing law and regulations creates an absolute barrier to creating a legal parent-child relationship with both parents, and is unconstitutional on its face and as applied to the Child Plaintiffs because it discriminates against the Child Plaintiffs on the basis of their parents' sexual orientation and/or sexual orientation and marital status.

286. Specifically,  the state's refusal does not permit the Child Plaintiffs to secure the benefits of a legal parent-child relationship that would inure to similarly situated children raised by heterosexual parents, who have the opportunity to be adopted by their stepparents.

287.     North Carolina, unlike many other states, does not permit gay or lesbian second parents to adopt.  As a result, the Child Plaintiffs cannot be recognized as the lawful children of the Second Parent Plaintiffs unless the Legal Parent Plaintiffs terminate their parental rights.

288.     North Carolina law, however, allows similarly situated children of heterosexual couples to be adopted by their second parent, provided that their second parent becomes their stepparent through marriage, and lives with them for six months.

289.     The Child Plaintiffs are thus being denied legal protections as a result of circumstances that are beyond their control and flow solely from the status of their parents.

290.     North Carolina's statutory scheme for adoption of children, as definitively interpreted by the North Carolina Supreme Court, creates a class of children who cannot be adopted by their second parent under any circumstances.  The statutory scheme is unconstitutional on its face and as applied to the Child Plaintiffs, who are deprived of the many protections, rights and privileges that flow to other children for no reason other than the fact that their parents are in a same-sex relationship, while children whose parents are heterosexual can be, and often are, adopted by stepparents.

291.     This categorical exclusion is not narrowly tailored to further any compelling government interest and, in fact, is not even rationally related to the furtherance of any legitimate government interest.

292.     Defendants' enforcement, under the color of state law, of North Carolina's adoption laws, including the categorical prohibition against second parent adoption by same-sex couples, deprives the Child Plaintiffs of their constitutional right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

293.    Defendants' deprivation of the Child Plaintiffs' constitutional rights violates the

Civil Rights Act, 42 U.S.C. § 1983.

294.    The Child Plaintiffs have no adequate remedy at law to redress the wrongs alleged

herein, which are of a continuing nature and will cause irreparable harm.

295.    Unless defendants are enjoined, they will apply and/or cause to be applied North

Carolina's categorical prohibition against second parent adoption.

### SECOND CLAIM FOR RELIEF
(BY THE LEGAL AND SECOND PARENT PLAINTIFFS)
(PARENTS' RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF
THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983)

296.    Plaintiffs repeat and reallege paragraphs 1 to 28395 as if set forth in full.

297.    North Carolina's categorical refusal to permit applications for second parent

adoption by same-sex couples discriminates against those parents on the basis of their sexual

orientation.  In doing so, it deprives the Second Parent Plaintiffs of an opportunity to secure the

benefits of a legal parent-child relationship, while those benefits would inure to similarly situated

parents who are heterosexual.  Relatedly, the denial of second parent adoption deprives the Legal

Parent Plaintiffs of the protection of having their co-parents also be legally responsible for caring

for the children they are both raising together.

298.    The Second Parent Plaintiffs are denied an opportunity to secure the benefits of a

legal parent-child relationship because the state does not permit gay or lesbian second parents to

adopt, while heterosexual second parents can apply to adopt as stepparents.

299.    North Carolina's statutory scheme for adoption of children, as definitively

interpreted by the North Carolina Supreme Court, is unconstitutional on its face and as applied to

the Second Parent Plaintiffs because it violates the Equal Protection Clause of the United States

Constitution by categorically depriving the Second Parent Plaintiffs of the ability to create a legal parent-child relationship on no basis other than the fact that they are in a same-sex relationship.

300.    North Carolina's adoption laws further burden the Legal Parent Plaintiffs by placing sole legal responsibility for their children on their shoulders, without allowing them to share that responsibility with a second parent, while heterosexual parents are able to share legal parenting responsibility by consenting to adoption by a stepparent.

301.    This categorical exclusion is not narrowly tailored to further any compelling government interest and, in fact, is not even rationally related to the furtherance of any legitimate government interest.

302.    Defendants' enforcement, under the color of state law, of North Carolina's adoption laws, including the categorical prohibition against second parent adoption by same-sex couples, deprives the Legal and Second Parent Plaintiffs of their constitutional right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

303.    Defendants' deprivation of the Legal and Second Parent Plaintiffs' constitutional rights violates the Civil Rights Act, 42 U.S.C. § 1983.

304.    The Parent Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

305.    Unless defendants are enjoined, they will apply and/or cause to be applied North Carolina's categorical prohibition against second parent adoption.

### THIRD CLAIM FOR RELIEF
(BY THE LEGAL PARENT PLAINTIFFS)
(PARENTS' RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE
UNITED STATES CONSTITUTION, 42 U.S.C. § 1983)

306.    Plaintiffs repeat and reallege paragraphs 1 to 305 as if set forth in full.

307. Defendants' enforcement, under the color of state law, of North Carolina's adoption laws, including the categorical prohibition against consideration of applications for second parent adoption by same-sex couples, violates the Legal Parent Plaintiffs' fundamental right to parental autonomy protected by the Due Process Clause of the United States Constitution, by improperly burdening their fundamental right to make decisions concerning the care, custody, and control of their children.

308. North Carolina adoption law prevents the Legal Parent Plaintiffs from making fundamental decisions about their children that are central to their status as parents. These decisions include (i) the ability to take steps to have the family they have created become legally recognized; (ii) the ability to take steps to support an application for their partner to apply to be the legal second parent of a child already within the Legal Parent's legal custody; (iii) the ability to support and contribute to the making of a legally certain determination of who will receive custody of their child in the event of their death or incapacitation; (iv) the ability to support and contribute to the making of a legally certain determination of who will have the unquestioned ability to make decisions regarding their child's medical care; and (v) other decisions central to their child's health and wellbeing.

309. This categorical exclusion is not narrowly tailored to further any compelling government interest and, in fact, is not even rationally related to the furtherance of any legitimate government interest.

310. Defendants' deprivation of the Legal Parent Plaintiffs' constitutional rights violates the Civil Rights Act, 42 U.S.C. § 1983.

311. The Legal Parent Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

312.     Unless defendants are enjoined, they will apply and/or cause to be applied North Carolina's categorical prohibition against second parent adoption.

### FOURTH CLAIM FOR RELIEF
#### (BY ALL PLAINTIFFS)
#### (DUE PROCESS CLAUSE UNDER THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983)

313.     Plaintiffs repeat and reallege paragraphs 1 to 312 as if set forth in full.

314.     Defendants' enforcement, under the color of state law, of North Carolina's adoption laws, including the categorical prohibition of second parent adoption by same-sex couples, will deprive the Legal and Second Parent Plaintiffs, and their children, the Child Plaintiffs, of their constitutional right to family integrity protected by the Due Process Clause of the United States Constitution.

315.     North Carolina's adoption laws categorically prohibit the Second Parent Plaintiffs from securing a legally recognized adoption of the Child Plaintiffs.  This deprivation in turn prevents plaintiffs from enjoying other protections, rights and benefits enumerated above, to which they would otherwise be entitled.

316.     By withholding from plaintiff families the protections that flow from legal recognition of the parent-child relationship that exists between the Second Parent Plaintiffs and the Child Plaintiffs, the state burdens their constitutionally protected family integrity by creating uncertainty and insecurity, and denying these important legal protections and rights.

317.     Defendants' deprivation of the Parent Plaintiffs' constitutional rights violates the Civil Rights Act, 42 U.S.C. § 1983.

318.     The plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

319.     Unless defendants are enjoined, they will apply and/or cause to be applied North Carolina's categorical prohibition against second parent adoption.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

320.     A declaration that the adoption provisions of North Carolina General Statutes §§ 48-1-100 *et seq.*, including N.C. Gen. Stat. §§ 48-1-106, 48-3-202, 48-4-100–103, as construed by the North Carolina Supreme Court, violate plaintiffs' rights to due process and equal protection under the United States Constitution and 42 U.S.C. § 1983, and are thus void and unenforceable.

321.     An order enjoining defendants and those acting in concert with them from enforcing and/or applying restrictions against second parent adoption by same-sex couples either now or at any time in the future.

322.     An order directing defendants to accept applications for adoption from the Second Parents and to process such applications consistently with stepparent adoption applications, or by any other procedure determined by defendants that provides a path for the Second Parents to secure second parent adoption consistent with that currently provided to stepparents.

323.     An order awarding plaintiffs their costs, including their reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, to the extent permitted by law.

324.     An order awarding such other and further relief as the Court deems just and proper.

Dated: June 13, 2012
Raleigh, North Carolina

*Of Counsel:*

Rose A. Saxe
James D. Esseks
American Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004-2400
Telephone: (212) 549-2500
Facsimile: (212) 549-2646
rsaxe@aclu.org
jesseks@aclu.org

Elizabeth O. Gill
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 343-1237
Facsimile: (415) 255-1478
egill@aclunc.org

Christopher Brook
N.C. State Bar No. 33838
ACLU of North Carolina
P.O. Box 28004
Raleigh, North Carolina 27611-8004
Telephone: (919) 834-3466
Facsimile: (866) 511-1344
cbrook@acluofnc.org

Garrard R. Beeney
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-9007
BeeneyG@sullcrom.com

/s/ Jonathan D. Sasser
Jonathan D. Sasser
N.C. State Bar No. 10028
Jeremy M. Falcone
N.C. State Bar No. 36182
Ellis & Winters LLP
P.O. Box 33550
Raleigh, North Carolina 27636
Telephone Number: (919) 865-7000
Facsimile Number: (919) 865-7010
jon.sasser@elliswinters.com
jeremy.falcone@elliswinters.com

*Attorneys for the plaintiffs*