# EXHIBIT A

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

MARCIE FISHER-BORNE, for herself and as
guardian *ad litem* for M.F.-B., a minor;
CHANTELLE FISHER-BORNE, for herself and
as guardian *ad litem* for E.F.-B., a minor; TERRI
BECK; LESLIE ZANAGLIO, for herself and as
guardian *ad litem* for T.B.Z. and D.B.Z., both
minors; SHANA CARIGNAN; MEGAN
PARKER, for herself and as guardian *ad litem*
for J.C., a minor; LEIGH SMITH; CRYSTAL
HENDRIX, for herself and as guardian *ad litem*
for J.H.-S., a minor; DANA DRAA; LEE
KNIGHT CAFFERY, for herself and as guardian
*ad litem* for M.M.C.-D. and M.L.C.-D., both
minors; SHAWN LONG; CRAIG JOHNSON,
for himself and as guardian *ad litem* for I.J.-L., a
minor;

                    Plaintiffs,

          v.

JOHN W. SMITH, in his official capacity as the
Director of the North Carolina Administrative
Office of the Courts; THE HONORABLE
DAVID L. CHURCHILL, in his official capacity
as Clerk of the Superior Court for Guilford
County; THE HONORABLE ARCHIE L.
SMITH III, in his official capacity as Clerk of
the Superior Court for Durham County; ROY
COOPER, in his official capacity as the Attorney
General of North Carolina; WILLIAM
COVINGTON, in his official capacity as the
Register of Deeds for Durham County; and JEFF
THIGPEN, in his official capacity as the Register
of Deeds for Guilford County;

                    Defendants.

CIVIL ACTION NO. 1:12-cv-589

**FIRST AMENDED COMPLAINT**

# INTRODUCTION

1.     Plaintiffs are six North Carolina families. In each family, the adults are same-sex couples who seek the freedom to marry each other, or have their marriages respected. In each family, the adults are raising children together, and seek to ensure that both parents have legally recognized parent-child relationships. Because North Carolina law prevents these couples from marrying and bars one parent in each couple from legalizing their parental relationship with their children, plaintiffs bring this suit and allege violations of the federal constitution.

2.     Because of the numerous financial, psychological and social benefits that flow from a legally recognized parent-child relationship and marriage between spouses, each of the plaintiff families wishes to apply to establish via adoption a full, legal parental relationship between the child and the second parent. Specifically, in each of the plaintiff families, the non-legal parent wishes to apply to adopt the child or children he or she is currently raising as the partner of the legal parent (a process that is often referred to as "second parent adoption").

3.     Furthermore, to secure similar benefits and avoid multiple deprivations, the unmarried adult plaintiffs seek to marry in North Carolina, and the married adult plaintiffs seek to have their marriages from other jurisdictions recognized in North Carolina.

4.     Because of the gender and sexual orientation of the adult plaintiffs, they are denied the freedom to marry in North Carolina, and the out-of-state marriages of the Married Plaintiffs are effectively voided within North Carolina by North Carolina law which specifies that the plaintiffs' marriages are not "valid or recognized in the State." N.C. Const. art. XIV, § 6 (as amended). North Carolina law also prevents each of the parent plaintiffs ("Parent Plaintiffs" listed in paragraphs 280 and 281) who do not have a legal relationship with their child from

forming such a legal relationship in the only way they can — through application for adoption — also because of the Parent Plaintiffs' sexual orientation.

5.     Plaintiffs bring this action ("Action") to challenge the constitutionality of North Carolina's adoption laws that prevent the child plaintiffs ("Child Plaintiffs" listed in paragraph 282) from having a legal relationship with both of the child's parents, and to challenge the constitutionality of North Carolina's laws that exclude same-sex couples from marrying and that void within North Carolina the marriages of same-sex couples lawfully entered into in other jurisdictions.

6.     The adult plaintiffs seek the same legal recognition of their family relationships afforded heterosexual married spouses and their families for the same reason all families seek such relationships:  so the members of each the plaintiff couples can publicly declare their love and commitment before their friends, family and community, so each family member can achieve the benefits, security and protection that only a legal adoption and legal marriage can provide and so each family member can avoid the numerous psychological, social and financial detriments that arise from a lack of a legally recognized marriage or a legally recognized relationship between parent and child.

### Adoption

7.     Absent the freedom to marry, a second parent adoption is the only way that a family in North Carolina with gay or lesbian parents can ensure (i) that both parents have a legal relationship with their child and (ii) that the child receives the many protections and benefits of a legally cognizable parent-child relationship with both parents.  Children who are prevented from having such a legally recognized relationship with both parents suffer numerous deprivations as a result, including exclusion from private health insurance benefits, public health benefits,

veterans benefits, disability benefits, social security benefits, life insurance benefits and workers' compensation, as well as uncertainty about their ability to continue their relationship with their second parent if something should happen to their legal parent. While many other states do grant second parent adoptions in cases when they are in a child's best interests, under the law of North Carolina, as authoritatively construed by the North Carolina Supreme Court in *Boseman* v. *Jarrell*, 704 S.E.2d 494 (N.C. 2010),[1] second parent adoptions are categorically prohibited in North Carolina, resulting in the harms to plaintiffs set forth herein.

8.    Plaintiffs therefore bring this action because North Carolina's categorical prohibition on second parent adoption violates the constitutional rights and protections of children, who face direct and substantial deprivations — legal, psychological and otherwise — simply because they are being raised by gay or lesbian parents, and violates the rights of those parents, who face similar direct and substantial burdens on their rights simply because they are gay or lesbian.

9.    There is no basis for the state automatically and categorically to reject any petition for second parent adoption by gay or lesbian parents — without even considering what is best for the child — while simultaneously adjudicating any stepparent adoption petition by a heterosexual stepparent on its merits, according to what is in the child's best interest and otherwise consistent with established procedures.

### Marriage

10.    Like other couples who have made a lifetime commitment to each other, the Parent Plaintiffs who reside with each other and their children are spouses in every sense except

---

[1]    Further references to North Carolina's adoption statutes herein are a reference to those statutes as construed by the North Carolina Supreme Court in *Boseman*.

that North Carolina law will not permit them to marry or recognize their marriages from other jurisdictions.

11.     Because of the numerous financial, psychological and social benefits that flow from a legally recognized marriage, each of the adult plaintiffs who are unmarried wish to marry their partners.

12.     Parent Plaintiffs Marcie and Chantelle Fisher-Borne were married outside of North Carolina in the District of Columbia, and Parent Plaintiffs Shana Carignan and Megan Parker were married in the Commonwealth of Massachusetts.  As a group, plaintiffs Marie and Chantelle Fisher-Borne, Shana Carignan and Megan Parker are referred to as the "Married Plaintiffs."  Each of the Married Plaintiffs wishes to have her out-of-state marriage recognized in North Carolina.

13.     North Carolina's exclusion of same sex couples from marriage deprives such couples from many legal protections available to married spouses, including (without limitation) benefits available under tax laws; inheritance laws; retirement benefits; and insurance laws and contracts.  Moreover, depriving same sex couples of the freedom to marry undermines those couples' financial security and their ability to achieve life goals as couples, and deprives them of the immensely important dignity and status of marriage.

14.     If the adult plaintiffs were permitted to marry or have their out-of-state marriages recognized in North Carolina, they would then qualify to adopt the children they are raising without amendment or change to North Carolina's existing adoption laws.

## CONSTITUTIONAL VIOLATIONS

15.     By depriving the plaintiffs of the freedom to marry and the right to apply to adopt the children they are raising, North Carolina stigmatizes plaintiffs and relegates them to second

class status. The laws forbidding marriage and preventing a parent from establishing a legal relationship with her child tell the plaintiffs that their relationships are less worthy, humiliating each plaintiff and denigrating the integrity and closeness of their family.

16. North Carolina's exclusion of same-sex couples from marriage and adoption of the children they raise are both independently unconstitutional because such prohibitions infringe on the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. Each prohibition is subject to heightened scrutiny because (a) it discriminates against a suspect class and (b) it burdens several fundamental rights, including the right of parents to make decisions about the care and nurturing of their children and the integrity of their families, and the right to marry. Furthermore, the challenged laws cannot stand under any level of scrutiny, because the exclusions do not rationally further any legitimate government interest. They serve only to disparage and injure lesbian and gay couples and their families.

17. As a basis for their Action, plaintiffs respectfully allege as follows on the basis of their personal knowledge and otherwise on the basis of information and belief:

## NATURE OF THE ACTION

18. This Action is brought under 42 U.S.C. § 1983 against state actors who, acting in their official capacity under color of state law, are responsible for making and enforcing state policies and laws that directly infringe plaintiffs' constitutional rights under the Fourteenth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

19. Plaintiffs bring this Action pursuant to 42 U.S.C. § 1983.

20. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)-(4).

21.     All defendants are located, or otherwise are present and conducting business, within the state of North Carolina.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).  A substantial part of the events and omissions that gave rise to the plaintiffs' claims occurs in this judicial district.

## THE NORTH CAROLINA ADOPTION STATUTES

23.     North Carolina law permits an unmarried individual person to adopt children and does not distinguish, for purposes of approving or denying an adoption, among individuals who are gay, lesbian or heterosexual.

24.     Nevertheless, the gay and lesbian parents in the plaintiff families cannot petition for adoption jointly (i.e., as a couple), because N.C. Gen. Stat. § 48-2-301(c) provides that "[i]f the individual who files [an adoption] petition is unmarried, no other individual may join in [that] petition."

25.     Among the plaintiff families, the parent who is prevented from having a legal relationship with his or her child (the "second parent" or the "Second Parent Plaintiff") cannot file for an adoption as an individual unless the existing legal parent (the "Legal Parent Plaintiff") agrees to give up all of his or her existing parental rights.  Specifically, under N.C. Gen. Stat. § 48-3-606(9), an adoption petition must include a written consent to the adoption by any existing legal parent, and the existing legal parent must acknowledge that granting the adoption will result in the termination of his or her existing parental rights.  Similarly, under N.C. Gen. Stat. § 48-1-106(c), "[a] decree of adoption severs the relationship of parent and child between the individual adopted and that individual's biological or previous adoptive parents" and relieves the former parents "of all legal duties and obligations due from them to the adoptee."

-7-

26.     Thus, as a result of operation of the law — specifically that cited in paragraphs 23 through 25 above and the North Carolina Supreme Court's decision in *Boseman* — the plaintiff families are precluded from having both parents be recognized simultaneously as legal parents to their children.

27.     North Carolina law does recognize one exception to the termination provision described in paragraph 25.  Adoptions by a parent's legal spouse — a stepparent — are exempt from the termination requirement of N.C. Gen. Stat. § 48-1-106.  "A stepparent may file a petition under this Article to adopt a minor who is the child of the stepparent's spouse if . . . [t]he parent who is the spouse has legal and physical custody of the child, and the child has resided primarily with this parent and the stepparent during the six months immediately preceding the filing of the petition."  N.C. Gen. Stat. § 48-4-101.  Notably, according to N.C. Gen. Stat. § 48-1-106(d), adoption by a stepparent does not have "any effect on the relationship between the child and the parent who is the stepparent's spouse."

28.     N.C. Gen. Stat. § 48-1-101(18) defines "Stepparent" to mean "an individual who is the spouse of a parent of a child, but who is not a legal parent of the child."

29.     North Carolina does not recognize a marriage "between individuals of the same gender."  *See, e.g.*, N.C. Const. art. XIV, § 6 ("Amendment One"); N.C. Gen. Stat. §§ 51-1, 51-1.2.

30.     Because the Second Parent Plaintiffs are not considered to be "spouses" of the Legal Parent Plaintiffs under North Carolina law and cannot become "spouses" under North Carolina law even if they were to marry in another state, they are unable to use the stepparent adoption statute to adopt the children they are raising with their partners, without terminating the parental rights of their co-parents, the Legal Parent Plaintiffs.

31.     Prior to December 20, 2010 — when the North Carolina Supreme Court decided *Boseman* — the North Carolina District Court in Durham County entered adoption decrees allowing unmarried second parents to adopt children without terminating the parental rights of the legal parent.

32.     As discussed in greater detail below, the granting of such adoptions was consistent with actions of courts in numerous other states construing their own statutes, which are similar to North Carolina's.  Those courts have recognized that second parent adoption can be granted to unmarried individuals without terminating the legal parent's rights.

33.     Under the practice that existed prior to *Boseman*, adoption decrees allowing unmarried, second parents to adopt children without terminating the parental rights of the legal parent "effect[ed] a complete substitution of families for all legal purposes and establishe[d] the relationship of parent and child . . . between . . . [the non-biological parent] and the individual being adopted," while at the same time "not sever[ing] the relationship of parent and child between the individual adopted and that individual's biological mother."  *Boseman*, 704 S.E.2d at 497.

34.     In *Boseman*, the Supreme Court of North Carolina held that the district court lacked subject matter jurisdiction to issue the adoption decree described in paragraphs 31–33 above because the type of adoption sought, allowing a legal parent's same-sex partner to become a second legal parent, was not permitted under North Carolina law.  *Id.* at 505.

**OTHER STATES GRANT SECOND PARENT ADOPTION, RECOGNIZING THAT SUCH ADOPTIONS ARE IN THE BEST INTERESTS OF CHILDREN**

35.     Courts in many other jurisdictions with adoption statutes similar to North Carolina's permit second parent adoption by unmarried gay and lesbian parents.

36.     For example, courts in California, Indiana, New Jersey, New York, Vermont, the District of Columbia, Delaware, Illinois, Massachusetts, Pennsylvania and Maine have held that their adoption statutes permit second parent adoption, and have explicitly recognized that permitting second parent adoption furthers the best interests of children.  *See, e.g., Sharon S.* v. *Superior Court*, 73 P.3d 554 (Cal. 2003); *In re Jacob*, 660 N.E.2d 397 (N.Y. 1995); *In re Adoption of B.L.V.B.*, 628 A.2d 1271 (Vt. 1993); *In re Adoption of K.S.P.*, 804 N.E.2d 1253 (Ind. Ct. App. 2004); *In re Adoption of Two Children by H.N.R.*, 666 A.2d 535 (N.J. Super. Ct. App. Div. 1995); *In re M.M.D.*, 662 A.2d 837, 860 (D.C. 1995); *In re Hart*, 806 A.2d 1179 (Del. Fam. Ct. 2001); *In re Petition of K.M.*, 653 N.E.2d 888 (Ill. App. Ct. 1995); *Adoption of Tammy*, 619 N.E.2d 315 (Mass. 1993); *In re Adoption of R.B.F.*, 803 A.2d 1195 (Pa. 2002); *In re Adoption of M.A.*, 930 A.2d 1088 (Me. 2007).

37.     In addition, the laws of Connecticut, Colorado and Vermont expressly authorize second parent adoption. Conn. Gen. Stat. § 45a-724(3); Colo. Rev. Stat. § 19-5-203(d.5)(I); Vt. Stat. Ann. tit. 15A, § 1-102(b).

38.     In summarizing the benefits of second parent adoption, the Indiana Court of Appeals found that "[a]llowing a second parent to share legal responsibility for the financial, spiritual, educational, and emotional well-being of the child in a stable, supportive, and nurturing environment can *only* be in the best interest of that child."  *In re Adoption of M.M.G.C.*, 785 N.E.2d 267, 270-71 (Ind. Ct. App. 2003) (emphasis added).

39.     Other state courts have found that, because second parent adoption furthers the same purpose as stepparent adoptions, statutes like North Carolina's that expressly permit stepparent adoptions should be broadly construed in furtherance of the goal of the statute to permit second parent adoption.  *See, e.g., In re Adoption of Two Children by H.N.R.*, 666 A.2d at

539 ("[W]here the mother's same-sex partner has, with the mother's consent, participation and cooperation, assumed a full parental role in the life of the mother's child, and where the child is consequently bonded to the partner in a loving, functional parental relationship, the stepparent provision of [the New Jersey termination statute] should not be narrowly interpreted so as to defeat an adoption that is clearly in the child's best interests."); *In re Hart*, 806 A.2d at 1186-88 (reading Delaware stepparent exception broadly to further the best interests of the children); *In re M.M.D.*, 662 A.2d at 860 (D.C. 1995) (same).

40. Altogether, 20 states plus the District of Columbia currently permit gay and lesbian parents to obtain second parent or stepparent adoptions.

**WHILE NORTH CAROLINA PROHIBITS ADOPTION BY SECOND PARENTS, NORTH CAROLINA LAWS AND POLICIES OTHERWISE RECOGNIZE THE VALUE THAT GAY AND LESBIAN COUPLES PROVIDE AS PARENTS**

**Minimum Standards for Family Foster Homes**

41. There are many ways in which North Carolina law currently recognizes the legitimacy of lesbian and gay parents, and does not prevent gay or lesbian persons from being recognized as parents.

42. North Carolina's Division of Social Services ("DSS") has the authority to enact foster and adoptive parent eligibility requirements, and has enacted such regulations, which are contained in the Minimum Standards for Family Foster Homes ("Foster Care Standards").

43. The Foster Care Standards articulate the official state policy as to the placement of children in state-licensed foster care. Such licensure is, as a practical matter, a prerequisite to adoption of any children from the state foster care system.

44. The Foster Care Standards state, that as a matter of official North Carolina state policy, "Foster parents shall be persons whose behaviors, circumstances and health are

conducive to the safety and well being of children."  DSS, Foster Care Standards § IV.B (rev.

Oct. 2002), *available at* http://info.dhhs.state.nc.us/olm/manuals/dss/csm-40/chg/CS1213.pdf.

45.     The comment to § IV.B of the Foster Care Standards states that sexual orientation

is irrelevant to a determination of the suitability of a home for foster parenting:

> Regarding "non-traditional" family foster homes, **the Division of Social Services has no policy that disqualifies any family from consideration based solely on their marital status or sexual preference**.  The state DSS position is that the county DSS or other agency must make these decisions based on their assessment of the family's ability to meet the needs of individual children who are in need of family foster home placement.  If the agency documents through a thorough assessment that the individual or couple's [marital] status or sexual preference will jeopardize their ability to meet the needs of children, then the licensure process should not proceed.
>
>         Attorney General guidance from a letter dated August 5, 1991 includes the following, "***From a social work perspective [prohibiting licensing of 'nontraditional' families] is totally irrational in that your sexual orientation per se has no relationship to your ability to parent a child or necessarily represents the best interests of the child.***"

Foster Care Standards § IV.B (emphasis added).

46.     In certifying individuals for foster or adoptive placements, DSS requires that a

home study be conducted to determine whether a particular placement would be in the child's

best interests.  *See* DSS, Administrative Regulations and Procedures § II.D (rev. Oct. 2002),

*available at* http://info.dhhs.state.nc.us/olm/manuals/dss/csm-40/chg/CS1213.pdf.  This home

study includes an assessment of whether other individuals who are currently in the home,

including an unmarried partner, would be suitable caretakers for the children.  *Id.*

47.     As described below, DSS places children in the homes of same-sex couples after

determining that those placements would be in the best interests of the children.

48.     Adoptions by gay or lesbian individuals in committed long-term relationships are

granted in North Carolina after a judicial finding that a life with those parents would be in the

best interests of the child.  However, as a result of North Carolina law, the second parent within

any particular home cannot petition to become another legal parent alongside his or her same-sex partner.

### *De Facto* Parent Doctrine

49.     Notwithstanding the prohibition on petitions for second parent adoption, North Carolina does recognize a limited *de facto* parent doctrine, which allows a judge to award certain limited rights, such as custody and visitation, to a non-legal parent based on that parent's role in the child's life.

50.     A "*de facto* parent" is generally defined to be an "adult who (1) is not the child's legal parent, (2) has, with the consent of the child's legal parent, resided with the child for a significant period, and (3) has routinely performed a share of the caretaking functions at least as great as that of the parent who has been the child's primary caregiver without any expectation of compensation for this care."  Black's Law Dictionary 1222 (9th ed. 2009); *see also Boseman*, 704 S.E.2d at 503-04.

51.     Under North Carolina law, a *de facto* parent may have standing in certain circumstances to seek visitation or custody of a child.  *See* N.C. Gen. Stat. § 50-13.1(a) (conveying standing to initiate a custody proceeding to any "other person . . . claiming the right to custody of a minor child").

52.     North Carolina courts have awarded joint custody to gay or lesbian second parents under the *de facto* parent doctrine.  *See Mason* v. *Dwinnell*, 660 S.E.2d 58, 63 (N.C. Ct. App. 2008) (affirming award of custody to *de facto* parent); *Boseman*, 704 S.E.2d at 505 (same). Courts have done so in recognition of the significance of the second parent's role in their child's life.  *See, e.g.*, *Boseman*, 704 S.E.2d at 503 (nonparent may become a *de facto* parent "when a parent brings a nonparent into the family unit, represents that the nonparent is a parent, and

-13-

voluntarily gives custody of the child to the nonparent without creating an expectation that the relationship would be terminated").

53.     A court may even award full custody to a *de facto* parent if, in such circumstance, it would be in the best interest of the child.  *Boseman*, 704 S.E.2d at 503-04 ("As a result of the parties' creation, the nonparent became the only other adult whom the child considers a parent.").

54.     Despite the recognition through the *de facto* parent doctrine of a second parent's significant role in the life a child, *de facto* parent status does not create a full parent-child relationship.  While a *de facto* parent may be permitted to make custodial decisions, he or she cannot access and does not receive any of the other attendant rights, privileges and responsibilities that flow automatically from legal parent status.

55.     Moreover, *de facto* parentage can be recognized only by a judicial decision in the context of a custody dispute, and is therefore unavailable to the plaintiff families, which are intact families where both parents agree that they should have joint legal custody and share parental responsibilities and obligations.

## FORBIDDING APPLICATIONS FOR SECOND PARENT ADOPTION ADVANCES NO COMPELLING OR EVEN LEGITIMATE STATE PURPOSE

56.     North Carolina's categorical ban on second parent adoption serves no compelling or even legitimate government purpose or interest.

57.     Any valid interest of the state can be fully vindicated though the current adoption process that applies to all applicants, including stepparents.

58.     The question of whether an adoption by a second parent is in an individual child's best interest can be determined only through an individualized review process, not through categorical bans such as that applied in North Carolina.

-14-

59.     North Carolina's current foster care and adoption policies do not deny that gay and lesbian individuals are suitable parents.

60.     There is a consensus in the scientific literature that children raised by same-sex couples are just as well adjusted as children raised by heterosexual couples.

61.     The Legal Parent Plaintiffs and Second Parent Plaintiffs will continue raising the Child Plaintiffs regardless of whether the parent-child relationships between the child and the second parent are legally validated, albeit absent numerous benefits that would come through legal recognition of the parent-child relationships.

62.     Consequently, North Carolina's ban on second parent adoption does not affect the number of children raised by either same-sex or heterosexual couples.

63.     Likewise, a categorical ban on second parent adoption does not eliminate the possibility of custody disputes in families headed by same-sex couples, because second parents who have developed a parent-child relationship already have standing to petition for custody or visitation as *de facto* parents.

## THE NORTH CAROLINA MARRIAGE LAWS

### North Carolina Marriage Statutes

64.     North Carolina statutory law defines marriage as being between one man and one woman, thereby prohibiting marriage by persons of the same sex. North Carolina Gen. Stat. § 51-1 provides in relevant part: "A valid and sufficient marriage is created by the consent of a male and female person who may lawfully marry, presently to take each other as husband and wife, freely, seriously and plainly expressed by each in the presence of the other . . . ."

65.     North Carolina statutory law explicitly provides that marriages by persons of the same gender are not valid. North Carolina Gen. Stat. § 51-1.2 provides: "Marriages, whether

created by common law, contracted, or performed outside of North Carolina, between individuals of the same gender are not valid in North Carolina."

### The North Carolina Anti-Marriage Amendment ("Amendment One")

66.     On May 8, 2012, section 6 of Article XIV of the North Carolina Constitution was amended to exclude same-sex couples from the freedom to marry in North Carolina and to void within North Carolina the lawful marriages of same-sex couples from other jurisdictions.

67.     Amendment One provides

> Marriage between one man and one woman is the only domestic legal union that shall be valid or recognized in this State.  This section does not prohibit a private party from entering into contracts with another private party; nor does this section prohibit courts from adjudicating the rights of private parties pursuant to such contracts.

N.C. Const. art. XIV, § 6 (as amended).

68.     Many of the justifications offered by public officials and others in support of Amendment One and excluding same-sex couples from marrying were based on a desire to denigrate same-sex relationships and demean same-sex couples, and evidenced animus toward gay and lesbian individuals because of their intimate and familial relationships.  Statements in support of Amendment One included the following:

    a.   "[Y]ou cannot construct an argument for same sex-marriage that would not also justify philosophically the legalization of polygamy and adult incest"; "In countries around the world where they legitimized same-sex marriage, marriage itself is delegitimized."[2]

---

[2]     Paige Lavender, *Paul Stam, North Carolina GOP Representative: Gay Marriage Leads to Polygamy, Incest*, Huffington Post (Aug. 31, 2011, 12:23 PM), http://www.huffingtonpost.com/2011/08/31/gay-marriage-north-carolina_n_943336.html.

b.  "We need to reach out to them and get them to change their lifestyle back to the one we accept"; "[The City of Asheville, North Carolina is] a cesspool of sin."[3]

c.  "[Y]ou don't rewrite the nature of God's design for marriage based on the demands of a group of adults."[4]

d.  Marriage by same-sex individuals "undermines the marriage culture by making marriage a meaningless political gesture, rather than a child-affirming social construct"; "We will have an inevitable increase in . . . all of the documented social ills associated with children being raised in a home without their married biological parents."[5]

e.  North Carolina residents were urged "to contribute money, 'so we can confront the devils against us on the other side.'"[6]

69.  As a result of Amendment One and the North Carolina marriage statute, N.C. Gen. Stat. § 51-1, the unmarried adult plaintiffs cannot marry their partners in North Carolina, and any lawful marriage conferred on the adult plaintiffs by any other jurisdiction is not valid or recognized in North Carolina.  *See* N.C. Gen. Stat. § 51-1.2 ("Marriages, whether created by common law, contracted, or performed outside of North Carolina, between individuals of the same gender are not valid in North Carolina.").

---

[3]     Statement of James Forrester, North Carolina Senate. Rob Schofield, *Anti-gay lawmakers speak their (very troubled) minds*, The Progressive Pulse (Sept. 9, 2011), http://pulse.ncpolicywatch.org/2011/09/09/anti-gay-lawmakers-speak-their-very-troubled-minds/#sthash.cjBqcRpy.dpuf.

[4]     Statements of Tami Fitzgerald, chairwoman of Vote For Marriage NC. CNN Wire Staff, *North Carolina passes same-sex marriage ban, CNN projects*, CNN (May 11, 2012, 11:01 AM), http://www.cnn.com/2012/05/08/politics/north-carolina-marriage.

[5]     Vote FOR Marriage NC, *The Threat to Marriage*, Honest NC (Jan. 25, 2012), http://honestnc.com/in-their-own-words-the-threat-to-marriage/#more-1165.

[6]     Statement of Jim Jacumin, former state Senator, speaking at a public forum hosted by Vote for Marriage NC. Craig Jarvis, *Marriage amendment galvanizes activists*, newsobserver.com (Mar. 29, 2012), http://www.newsobserver.com/2012/03/29/1965637/pro-marriage-amendment-rallies.html.

-17-

70.     While North Carolina gives effect to and recognizes marriages of heterosexual spouses from other jurisdictions, *see, e.g.*, *Parker* v. *Parker*, 46 N.C. App. 254, 257 (1980), Amendment One forbids giving effect to or recognizing marriages from other jurisdictions of same-sex spouses.

## OTHER BARRIERS TO MARRIAGE
## HAVE BEEN STRUCK DOWN

71.     As recently as the 1960s, many states prohibited marriage between people of different races.  That prohibition was struck down in *Loving* v. *Virginia*, 388 U.S. 1, 2 (1967) which declared that "the freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Id.* at 12.

72.     Our courts and our society have discarded, one by one, marriage laws that violated the Constitution's mandate of equality, such as anti-miscegenation laws and laws that denied married women legal independence and the right to make decisions for themselves. History has taught that the vitality of marriage does not depend on maintaining such discriminatory laws.  To the contrary, eliminating these unconstitutional impediments to marriage has enhanced the institution.  Ending the exclusion of gay and lesbian couples from marriage is no different.  Indeed, same-sex couples are marrying in 13 states and the District of Columbia, and the institution of marriage continues to thrive.

73.     This is because, at heart, marriage is both a personal and a public commitment of two people to one another, licensed by the state.  Through marriage, North Carolina recognizes a couple's decision to establish a family unit together and support one another and any children and other family members.

74.     Marriage contributes to the happiness and security of countless people, but it also contributes to society.  North Carolina, like other states, encourages and regulates marriage

through hundreds of laws that provide benefits to and impose obligations on married couples. In exchange, North Carolina receives the well-established benefits that marriage brings: stable, supportive families that contribute to both the social and economic well-being of the State.

75. The prohibition against marriage and recognition of out-of-state marriages for same-sex couples in North Carolina is not closely tailored to serve an important government interest or substantially related to an exceedingly persuasive justification. In fact, the prohibition fails any level of constitutional scrutiny. It is not even rationally related to either any legitimate justifications that were offered in support of it when Amendment One became law or any legitimate interest of North Carolina that defendants might now offer as a basis for denying same-sex couples the freedom to marry in North Carolina.

76. Neither tradition nor moral disapproval of same-sex relationships or marriage for lesbian and gay couples is a legitimate basis for unequal treatment of same-sex couples under the law. The fact that discrimination is long-standing does not immunize it from constitutional scrutiny. The Supreme Court has made clear that the law cannot, directly or indirectly, give effect to private biases and expressly rejected moral disapproval of marriage for same-sex couples as a legitimate basis for discriminatory treatment of lesbian and gay couples. *United States* v. *Windsor*, No. 12-307, slip op. at 21 (U.S. June 26, 2013) (an "interest in protecting traditional moral teachings reflected in heterosexual-only marriage laws" was not a legitimate justification for federal Defense of Marriage Act).

77. North Carolina cannot justify its denial of marriage to gay and lesbian couples by claiming an interest in preserving the public fisc or the coffers or private business. Saving money is not a justification for excluding a group from a government benefit without an independent rationale for why the cost savings ought to be borne by the particular group denied

the benefit. Moreover, the evidence will show that there is no factual basis for the notion that allowing and recognizing the marriages of same-sex couples will burden North Carolina financially or constitute a burden on business.

78. North Carolina's ban on marriage by same-sex couples is not rationally related to child welfare concerns. The government has a vital interest in protecting the well-being of children, but the exclusion of same-sex couples from marriage bears no relation to this interest. To the contrary, it harms children in North Carolina.

79. Excluding same-sex couples from marriage has no conceivable benefit to children of heterosexual couples. Denying same-sex couples the right to marry does not encourage opposite-sex couples who have children to marry or stay married for the benefit of the children. Regardless of whether same-sex couples are permitted to marry, the children of opposite-sex spouses will continue to enjoy the same benefits and protections that flow from their parents' marriage.

80. Excluding same-sex couples from marriage serves only to harm the children raised by lesbian and gay couples by denying their families significant benefits and by branding their families as inferior and less deserving of respect and, thus, encouraging private bias and discrimination.

81. The Supreme Court has called marriage "the most important relation in life," *Zablocki* v. *Redhail*, 434 U.S. 374, 384 (1978) (internal quotations marks omitted), and an "expression[] of emotional support and public commitment." *Turner* v. *Safley*, 482 U.S. 78, 95 (1987). This is as true for same-sex couples as it is for opposite-sex couples.

82. Same-sex couples such as the plaintiff couples are similarly situated to opposite-sex couples in all of the characteristics relevant to marriage.

83. Same-sex couples make the same commitment to one another as opposite-sex couples. Like opposite-sex couples, same-sex couples build their lives together, plan their futures together and hope to grow old together. Like opposite-sex couples, same-sex couples support one another emotionally and financially and take care of one another physically when faced with injury or illness.

84. Like many opposite-sex couples, all of the plaintiff same-sex couples are parents raising children together.

85. Same-sex couples seeking to marry are just as willing and able as opposite-sex couples to assume the obligations of marriage.

86. The plaintiff couples and other same-sex couples in North Carolina, if permitted to marry, would benefit no less than opposite-sex couples from the many legal protections and social recognition afforded to married couples.

87. There was a time when an individual's sex was relevant to his or her legal rights and duties within the marital relationship. For example, husbands had a duty to support their wives but not vice versa, and husbands had legal ownership of all property belonging to their wives. But these legal distinctions have all been removed such that the legal rights and duties of husbands and wives are now identical.

88. Regardless of whether they are provided the numerous benefits of marriage afforded to heterosexual couples, the adult plaintiffs will continue their committed relationship as spouses, albeit absent the numerous benefits that would come with a marriage recognized in North Carolina.

## ANY ALLEGED STATE INTEREST IN PREVENTING ADOPTIONS
## OR FORBIDDING MARRIAGE IS SUBJECT TO HEIGHTENED SCRUTINY

89.     North Carolina's categorical ban on second parent adoptions and the deprivations caused by such ban and Amendment One perpetuate historical discrimination against gay and lesbian persons whose sexual orientation is immutable and a core part of their identity. Amendment One also discriminates on the basis of gender, as each adult plaintiff is denied the right to marry her spouse — or have her marriage recognized — based solely on her gender. Indeed, Amendment One plainly limits marriage to a relationship based wholly on the gender of the spouses.  *See also* N.C. Gen Stat. §§ 51-1, 51-1.2.

90.     In the twentieth century and continuing to the present, lesbians and gay men have experienced a history of unequal treatment in the United States because of their sexual orientation.

91.     In the twentieth century and continuing to the present, lesbians and gay men have been subject to discrimination in the United States because of their sexual orientation.

92.     In the twentieth century and continuing to the present, lesbians and gay men have been subject to discrimination in the United States because of perceived stereotypes associated with being lesbian or gay.

93.     In the twentieth century and continuing to the present, lesbians and gay men have been subject to violence in the United States because of their sexual orientation.

94.     In the twentieth century and continuing to the present, lesbians and gay men have been harassed in the United States because of their sexual orientation.

95.     Discrimination against gay and lesbian individuals has, historically, given them limited ability to protect their interests through the legislative process.

-22-

96.     In terms of population share, openly gay men and lesbians are under-represented in federal and state elected office, and in the judiciary.

97.     The majority of people in North Carolina in particular, and in the United States generally, do not identify as gay and lesbian. Gay and lesbian persons are therefore a minority population.

98.     Lesbians and gay men have comparatively little ability to protect their interests through the normal political process.

99.     Other groups that face discrimination in society, such as women and racial minorities, have been able to secure statutory protections against such discrimination through federal civil rights legislation.

100.    With the sole exception of the federal Hate Crimes Act, passed in 2009, lesbians and gay men have secured no such federal non-discrimination protection, even today.

101.    Instead, the rights of lesbians and gay men have been voted on at the ballot box repeatedly, with the vote going against the lesbian and gay rights position almost every single time.

102.    For many gay and lesbian individuals, their sexual identity is a core part of their identity.

103.    Efforts to change a person's sexual orientation through interventions by medical professionals have not been shown to be effective.

104.    A person's sexual orientation — heterosexual or homosexual — bears no relation to his or her ability to participate in or contribute to society.

**Marcie and Chantelle Fisher-Borne, and M.F.-B. and E.F.-B.**

105.     Plaintiffs **Ms. Chantelle Fisher-Borne** and **Dr. Marcie Fisher-Borne** are residents of Durham, North Carolina.  The Fisher-Bornes have two children:  plaintiff **M.F.-B.**, a girl who is five years old, and plaintiff **E.F.-B.**, a boy who is one year and seven months old.

106.     Chantelle Fisher-Borne is thirty-eight years old and works as a non-profit and public health consultant on community development, housing and homelessness.  Marcie Fisher-Borne, also thirty-eight years old, holds a tenure-track faculty position at North Carolina State University.

107.     The Fisher-Bornes met while they were undergraduates at Louisiana State University.  After working summer undergraduate jobs in western North Carolina and continuing as graduate students at UNC-Chapel Hill, they were drawn to the area and never left.  They have lived in the Research Triangle area of North Carolina for over thirteen years.

108.     The Fisher-Bornes have known each other for nineteen years and have lived in a committed relationship for over sixteen years.  They had a formal commitment ceremony on May 31, 2003, at which time they both hyphenated their last names to recognize their union. They treated their commitment ceremony as any heterosexual couple would treat their marriage ceremony — they invited approximately 130 people and spent about a year planning their special day.  The celebration happened on a rural farm in North Carolina and they served locally grown food to the guests.  They exchanged their rings that day and mark it as the beginning of their union.  Marcie calls Chantelle her wife and Chantelle calls Marcie the same.

109.     The Fisher-Bornes were legally married in the District of Columbia in 2011.  But their marriage is not recognized by the State of North Carolina, which, according to the Fisher-

-24-

Bornes, is "a constant reminder that the world doesn't see us as a couple. It's even more painful when we think about our children."

110. Because their marriage is not recognized by the State of North Carolina, the Fisher-Bornes have been deprived of many of the benefits and subject to many of the deprivations set out in paragraph 322(a)-(q), *infra*.

111. Among other things, because their marriage is not recognized by the State of North Carolina:

    a. The Fisher-Bornes cannot file a joint state tax return and avail themselves of the tax benefits that the State of North Carolina confers upon married couples. Moreover, the Fisher-Bornes' ability to plan for their family's financial future is negatively impacted by the uncertainty over whether they may file a joint federal tax return in light of the State of North Carolina's refusal to recognize their marriage.

    b. The Fisher-Bornes are uncertain whether they will be able to get joint health insurance through USAA in light of the State of North Carolina's refusal to recognize their marriage.

    c. The Fisher-Bornes are at risk that North Carolina's inheritance laws would affect them negatively if one of them predeceases the other.

    d. The Fisher-Bornes are at risk that they will receive significantly fewer benefits from state-sponsored or private retirement plans, which they would otherwise be afforded if North Carolina recognized their marriage.

    e. The Fisher-Bornes constantly fear being denied access and decision-making ability during a crisis, for example, if a medical professional should deny one of them access to the other, or to one of their children, in a medical emergency.

112.     The Fisher-Bornes always wanted to have children, and each of them also wished to give birth to a child.  Marcie Fisher-Borne gave birth to her biological daughter M.F.-B.  Chantelle Fisher-Borne gave birth to her biological son E.F.-B.  Both women were involved in all aspects of the other's pregnancy.  They attended all of each other's prenatal appointments together and made preparations for the arrival of each child together.  Each was present when the other gave birth.

113.     M.F.-B. and E.F.-B. are developing mentally and physically as healthy, well-adjusted children.

114.     M.F.-B. calls Marcie Fisher-Borne "Mommy" and Chantelle Fisher-Borne "Mama."  The Fisher-Bornes have provided the only home that M.F.-B. and E.F.-B. have ever known.  They decided to hyphenate their last names in part because they were advised by their minister that it would help their family be recognized as a cohesive unit.

115.     Their loving, supportive and healthy family serves the best interests of M.F.-B. and E.F.-B.

116.     Chantelle Fisher-Borne's extended family embraces Marcie Fisher-Borne and both children without reservation.

117.     Marcie Fisher-Borne's father and her larger family now seem to accept Marcie Fisher-Borne and Chantelle Fisher-Borne's relationship and his grandchildren, but that has not always been the case.  Marcie Fisher-Borne and Chantelle Fisher-Borne still worry about what might happen to their family if Marcie Fisher-Borne were to die or become incapacitated and her family members were to challenge Chantelle Fisher-Borne's parentage of M.F.-B.

118.     Despite the fact that both the Fisher-Bornes participate equally in all aspects of raising their children, under North Carolina law, only Marcie Fisher-Borne is recognized as a

legal parent to M.F.-B., and only Chantelle Fisher-Borne is recognized as a legal parent to E.F.-B. Chantelle Fisher-Borne is a second parent to M.F.-B. Marcie is a second parent to E.F.-B.

119. Under North Carolina's adoption statutes, Chantelle Fisher-Borne could adopt M.F.-B. only if Marcie Fisher-Borne signed away her own parental rights. Likewise, if Marcie Fisher-Borne ever sought to adopt E.F.-B., Chantelle Fisher-Borne would be required to sign away her parental rights. Thus, North Carolina law bars both mothers from being simultaneously recognized as their children's legal parents.

120. Nonetheless, if Chantelle Fisher-Borne were able to file a petition for a second parent adoption of M.F.-B. and if Marcie Fisher-Borne were able to file a petition for the adoption of E.F.-B., and were either of those petitions to be considered pursuant to other existing law and regulation, on information and belief, these petitions would be granted as in the children's best interests.

121. The Fisher-Bornes have not yet tried to explain to M.F.-B. or E.F.-B. the different legal statuses that their mothers hold or the effect of those different statuses and the harms they cause.

122. The Fisher-Bornes both believe that once either M.F.-B. or E.F.-B. is old enough to understand that his or her bonds with his or her second parent are less legally secure, M.F.-B. or E.F.-B. will experience anxiety and feelings of insecurity about the stability of his or her family.

123. Although the Fisher-Bornes have undertaken efforts to ensure that each will be able to continue life with minimum legal disruption if the other were to die or become

incapacitated, and to avoid the harms that the statutory adoption scheme causes to their family, such steps cannot give their family the full protections of legal parentage.

124. The insecurity to the Fisher-Bornes caused by North Carolina law was manifest on the night of M.F.-B.'s birth. When Marcie Fisher-Borne was transferred to the maternal floor of the hospital after four days of labor, the first nurse that the family encountered there demanded Chantelle Fisher-Borne's power of attorney to allow her to remain at Marcie Fisher-Borne's side. Fortunately, in that instance, the Fisher-Bornes had brought that particular document with them to the hospital. However, based in part on this experience, they constantly worry that if one of the children were to experience a sudden medical emergency, the second parent would be unable to arrange for proper care.

125. If either Chantelle Fisher-Borne or Marcie Fisher-Borne were to die or become incapacitated, both parents believe it would be in the children's best interests to continue to be raised by the other parent.

126. Absent a legal relationship with M.F.-B., there is no way for Chantelle Fisher-Borne to ensure that she would be legally permitted to continue to raise M.F.-B.

127. Likewise, absent a legal relationship with E.F.-B., there is no way for Marcie Fisher-Borne to ensure that she would be legally permitted to continue to raise E.F.-B.

128. Because of the uncertainty inherent in the status of a second parent in North Carolina, the Fisher-Bornes worry that if something were to happen to the other, either individuals or state actors might seek to challenge the second parent's parental status or guardianship.

129. The granting of either of those petitions would prevent these plaintiffs from suffering the harms set out in this Complaint.

130. As authorized by the Court on July 30, 2012, Marcie Fisher-Borne appears in this Action in her capacity as guardian *ad litem* for M.F.-B.

131. As authorized by the Court on July 30, 2012, Chantelle Fisher-Borne appears in this Action in her capacity as guardian *ad litem* for E.F.-B.

### Terri Beck, Leslie Zanaglio, T.B.Z. and D.B.Z.

132. Plaintiffs **Terri Beck** and **Leslie Zanaglio** are residents of Morrisville, North Carolina. Their two sons, plaintiffs **T.B.Z.** and **D.B.Z.**, are biological brothers, ages eleven and twelve, respectively.

133. Ms. Beck is fifty years old and is a staff recruiter at Duke University. Ms. Zanaglio is fifty-one years old and is the director of operations at a benefits and investment consulting firm. Ms. Beck and Ms. Zanaglio have lived in a committed same-sex relationship for sixteen years. They both wear rings that they bought for each other and celebrate January 18 as their anniversary — the day they met. They typically call one another "partner" now but if they were married, they would call each other "wife."

134. Ms. Beck and Ms. Zanaglio love North Carolina and would like to marry one another in their home state and thereby achieve the many benefits afforded to married persons in North Carolina.

135. Because they cannot marry under the laws of North Carolina, Ms. Beck and Ms. Zanaglio have been deprived of many of the benefits and subject to many of the deprivations set out in paragraph 322(a)-(q), *infra*.

136. Among other things, because they cannot marry under the laws of North Carolina:

    a. Ms. Beck and Ms. Zanaglio estimate that they pay approximately $7000 to $10,000 every year more than they would if they were able to file joint federal and state

income tax returns, which they could do if they were allowed to marry under North Carolina law.

b. If they were married, both Ms. Beck and Ms. Zanaglio would be entitled to joint adoption benefits. Because they cannot legally marry in North Carolina, Ms. Beck is denied those adoption benefits.

c. Even though T.B.Z. and D.B.Z. are covered under Ms. Beck's health insurance through Ms. Beck's employer, because Ms. Beck cannot marry Ms. Zanaglio under the laws of North Carolina, they are denied the tax savings related to that insurance that married couples receive.

d. Furthermore, Ms. Beck and Ms. Zanaglio fear that as T.B.Z. enters middle school, he will face taunting and adversity because his parents are unable to marry under the laws of North Carolina and because they are in a relationship that the State of North Carolina has labeled as "wrong."

e. For Ms. Beck and Ms. Zanaglio, one of the most harmful aspects of Amendment One to their family was trying to explain the Amendment to their children.

f. T.B.Z. and D.B.Z. want their parents to be able to marry under the laws of North Carolina — after the *Windsor* decision, they asked whether their parents would be having a wedding now, and whether they could wear green tuxedos.

137. Ms. Beck and Ms. Zanaglio began dating in their mid-thirties, and since the beginning of their relationship, they hoped one day to start a family of their own. Ms. Beck and Ms. Zanaglio eventually decided to start a family by becoming foster parents, with the ultimate goal of adopting children. Ms. Beck was particularly comfortable with the idea of fostering a

child because she was raised by her grandparents, who cared for nineteen foster children over the course of her life.

138.    In July 2007, when they had already been together for more than 10 years, Ms. Beck and Ms. Zanaglio decided to move from Ohio to North Carolina, where they had frequently vacationed, with the goal of starting a family there.  Ms. Beck and Ms. Zanaglio dedicated the following year to the preparations required to become foster parents.

139.    In order for Ms. Beck and Ms. Zanaglio's household to become certified as a foster home under North Carolina law, both women were required to undergo the same extensive training, education and scrutiny.

140.    For basic foster parenting certification, Ms. Beck and Ms. Zanaglio attended thirty hours of parenthood training, spread out over many weeks and weekends.  They also chose to take special classes on how to raise children with special needs, including children who had suffered significant abuse or neglect.

141.    In addition to attending classes and parenting workshops, both Ms. Beck and Ms. Zanaglio underwent extensive background checks, as well as several home inspections — including fire and safety inspections, social work inspections and interviews in conjunction with home visits from social workers — that evaluated the overall fitness of their home for foster children.

142.    Throughout this process, officials employed by DSS and the family services agency that was assisting their effort to become adoptive parents were fully aware that Ms. Beck and Ms. Zanaglio were in a committed relationship.  Ms. Beck and Ms. Zanaglio were told by state officials that their sexual orientation would not be a negative factor in DSS's evaluation of them and their home, and the women have no reason to suspect that their sexual orientation was

considered adversely in DSS's decision to approve their household as a foster home, or each of them as foster parents.

143.    Ms. Beck and Ms. Zanaglio were both approved and licensed as foster parents in 2008.

144.    Ms. Beck and Ms. Zanaglio expressed a preference to foster and ultimately adopt siblings between the ages of four and eight years old.

145.    In early 2009, Ms. Beck and Ms. Zanaglio received a call from their family services agency to advise them that there were two brothers with "special needs" in need of a foster family who might be a good match for their home.  T.B.Z. and D.B.Z., then six and seven, respectively, had been in and out of foster care their whole lives, and had suffered significant physical and emotional abuse and neglect.  After their biological father died in 2005, the boys' biological mother's parental rights were terminated, and the boys became available for a foster-to-adopt placement.  Both boys had been diagnosed with post-traumatic stress disorder (PTSD).

146.    After several months in which the boys and their mothers got to know each other, T.B.Z. and D.B.Z. moved into Ms. Beck and Ms. Zanaglio's home on a full-time basis in June 2009.

147.    Before the adoption of the boys was finalized in July 2010, social workers visited the house at least monthly.  In addition, Ms. Beck and Ms. Zanaglio made trips to the DSS to check in at least monthly, and they attended meetings with DSS employees to ensure that they were sufficiently sophisticated and trustworthy to manage the benefits that the brothers would continue to receive from the state.

148.    Creating and providing a family structure for two boys who previously had none has required a significant amount of time and energy from both Ms. Beck and Ms. Zanaglio.

Ms. Beck and Ms. Zanaglio's commitment helped the brothers settle into the possibility of having found their "forever family."

149.    Ms. Beck and Ms. Zanaglio took numerous steps to make the transition a good one for their sons.  They arranged for a behavior specialist to come to their home to work with the boys to treat severe PTSD, sometimes two or three days per week.  D.B.Z. still attends therapy every week.

150.    The boys also require extra educational support.  Both boys have received special tutoring and are now attending after-school care that provides them with a smaller adult-to-child ratio and greater individualized attention.  Both the tutoring and the personalized after-school care have entailed considerable expense.  Ms. Beck and Ms. Zanaglio have also invested countless hours helping their sons with homework and attend parent-teacher conferences more frequently than most parents.

151.    The boys have passed through normal and healthy phases of depression, anger, anxiety and grief, while adjusting to the stability and love in their new home.

152.    Ms. Beck and Ms. Zanaglio have both been found by the state to be suitable parents for T.B.Z. and D.B.Z.

153.    Despite this fact, and despite the fact that Ms. Zanaglio and Ms. Beck underwent the same careful scrutiny in order to become certified as foster parents, only one of the mothers was permitted to legally adopt the boys as a matter of North Carolina law.  Thus, while both Ms. Beck and Ms. Zanaglio have committed to share equally in all of their parental responsibilities for the rest of their lives, only Ms. Zanaglio is legally recognized as a parent to the boys.  Ms. Beck and Ms. Zanaglio chose Ms. Zanaglio to be the legally recognized parent

because she was the higher wage-earner and therefore had accumulated more savings, which they believed would increase the probability that the adoption would be granted.

154.    Since being placed in Ms. Beck and Ms. Zanaglio's home, T.B.Z. and D.B.Z. have thrived in the stable, nurturing and loving environment that their parents and their loving extended families provide. The boys are in good physical health, and are performing better in school since coming to live with Ms. Beck and Ms. Zanaglio.

155.    Ms. Beck and Ms. Zanaglio's home and their family serve the best interests of T.B.Z. and D.B.Z.

156.    The boys consider both Ms. Beck and Ms. Zanaglio to be their equal parents. When both women are within earshot, the boys call Ms. Beck "Mama T" and they call Ms. Zanaglio "Mama Leslie"; when there is no chance of confusion, the boys simply refer to either woman as "Mom."

157.    Ms. Beck and Ms. Zanaglio have not yet tried to explain to their children the different legal statuses that their mothers hold or the effect of those different statuses and the harms they cause.

158.    Ms. Beck and Ms. Zanaglio both believe that when the boys are old enough to understand that their bonds with Ms. Beck are less legally secure, they will experience anxiety about the possibility of losing yet another parent.

159.    Although Ms. Beck and Ms. Zanaglio have undertaken efforts to ensure that each will be able to continue life with minimum legal disruption if the other were to die or become incapacitated, and to avoid the harms that the statutory adoption scheme causes to their family, such steps cannot give their family the full protection of legal parentage.

160.    Under North Carolina's adoption statutes, in order for Ms. Beck to become a legal parent to her boys through adoption, Ms. Zanaglio would be required to sign away and terminate all of her own parental rights.  Thus, North Carolina law bars both mothers from simultaneously being recognized as legal parents to their children.

161.    Nonetheless, if Ms. Beck were ever permitted to file a petition for a second parent adoption of T.B.Z. and D.B.Z., and were that petition to be considered pursuant to other existing law and regulation, on information and belief, such a petition would be granted as in the children's best interests.  In fact, because both Ms. Beck and Ms. Zanaglio already have been determined by the state to be suitable parents for their children, such an outcome is virtually certain.

162.    If Ms. Zanaglio were to die or become incapacitated, both Ms. Zanaglio and Ms. Beck believe it would be in the children's best interests for Ms. Beck to continue raising the children as their parent.

163.    Absent a legal relationship with T.B.Z. and D.B.Z., there is no way for Ms. Beck to ensure that she would be legally permitted to do so.

164.    If Ms. Zanaglio did pass away, the boys would have no legal parent for an undetermined period of time.

165.    During the time that Ms. Beck and Ms. Zanaglio were fostering T.B.Z. and D.B.Z., their household received a foster care subsidy from the state.  Ms. Zanaglio continues to receive an adoption subsidy as the boys' legal parent.

166.    Both the foster care subsidy and the adoption subsidy exist to encourage and support families that provide homes to children in need.

167.    Ms. Beck and Ms. Zanaglio rely on the subsidy in parenting T.B.Z. and D.B.Z. and worry that if something were to happen to Ms. Zanaglio, the subsidy would not continue and the children would be additionally harmed by the deprivation of an important benefit to which they are otherwise entitled under North Carolina law.

168.    The granting of the petition would prevent these plaintiffs from suffering the harms set out in this Complaint.

169.    As authorized by the Court on July 30, 2012, Ms. Zanaglio appears in this Action in her capacity as guardian *ad litem* for T.B.Z. and D.B.Z.

### Shana Carignan, Megan Parker and J.C.

170.    Plaintiff **Shana Carignan** is a lifelong native of North Carolina from Greensboro. Plaintiff **Megan Parker** is a lifelong native of North Carolina from Blowing Rock.  Their son, plaintiff **J.C.**, whom they adopted from foster care in 2011, is five years old.

171.    Ms. Carignan and Ms. Parker have lived together in Greensboro in a committed same-sex relationship for five years.  Ms. Carignan is thirty years old and is a development associate for a local nonprofit that supports individuals with HIV or AIDS.  Ms. Parker is thirty-four years old and currently cares for J.C. at home, although she previously worked as an Alternative Family Living provider for over ten years.

172.    Ms. Carignan and Ms. Parker had a commitment ceremony in Greensboro in 2010.  They invited approximately sixty-five people, and the ceremony was attended by both Ms. Carignan's family and Ms. Parker's family, as well as J.C., who was thrilled to see his parents formally commit to a union.  They exchanged vows, exchanged rings, had wedding cake and received toasts from family and loved ones.  Shana calls Megan her wife and Megan calls Shana the same.

-36-

173.    On September 13, 2012, they were legally married in the Commonwealth of Massachusetts.  Even though they mark their anniversary from their commitment ceremony, Ms. Carignan and Ms. Parker were struck by the seriousness of being legally joined on that day. According to Ms. Carignan, "To have an officiant take it so seriously, to stand before us and make it real — we wish we could feel this way in our own state, to have all of our friends and family present when we were legally married, it was such a special moment.  We were there for just a moment in Massachusetts, just people being married."

174.    The marriage of Ms. Carignan and Ms. Parker is not recognized by the State of North Carolina, and they thereby have been deprived of many of the benefits and subject to many of the deprivations set out in paragraph 322(a)-(q), *infra*.

175.    Among other things, because the State of North Carolina does not recognize their marriage:

a.   Ms. Parker cannot receive health benefits through Ms. Carignan's employer. This is especially harmful because Ms. Parker suffers from a health condition and purchasing private health insurance would cost them between $900–1200 per month.

b.   Because the State of North Carolina does not recognize their marriage, Ms. Carignan and Ms. Parker's ability to plan for their family's financial future is negatively and wrongfully impacted by the uncertainty over whether they may file a joint federal tax return in light of the State of North Carolina's refusal to recognize their marriage.

c.   Both Ms. Carignan and Ms. Parker are at risk that they will be deprived benefits that they would otherwise receive under North Carolina's inheritance laws should one of them die.

d.   Ms. Carignan and Ms. Parker have suffered substantial out-of-pocket expenses to pay for lawyers to draft legal documents to govern their lives — documents that are unnecessary for couples whose marriages are recognized by the state.  For example, Ms. Parker's medical situation required the drafting of a "special needs trust," which would not have been needed if their marriage were recognized by North Carolina.

176.    Ms. Carignan and Ms. Parker always knew they wanted children, and Ms. Parker's work providing care for disabled individuals inspired the couple to adopt a child with special needs.

177.    In order for Ms. Carignan and Ms. Parker's household to become certified as an Alternative Family Licensed home in North Carolina, both mothers were required to undergo equally extensive training, education, and scrutiny.

178.    To comply with North Carolina's foster parenting certification requirements, Ms. Carignan and Ms. Parker each attended thirty hours of parenthood training.  In addition to attending classes and parenting workshops, both Ms. Carignan and Ms. Parker submitted to extensive background checks, and a number of home inspections — including fire and safety inspections, social work inspections and interviews in conjunction with home visits from social workers — to evaluate the overall fitness of their home for adoptive children.

179.    Throughout this process, officials employed by the family services agency that was assisting Ms. Carignan and Ms. Parker's efforts to become adoptive parents were all fully aware that Ms. Carignan and Ms. Parker were in a committed, same-sex relationship.

180.    After their home study and trainings were complete, Ms. Carignan and Ms. Parker — who had already received Alternative Family Licenses — reviewed the files of young children with special needs who needed placement, and identified J.C. as one such child.  They

-38-

were referred to J.C. through a placement agency in North Carolina that matches children anywhere in the country with parents in North Carolina who are willing to adopt a child with special needs. J.C. became available for adoption at a group facility in Texas.

181.    J.C. was born in Texas in 2007. He has cerebral palsy that is exacerbated by the poor care he received following his birth. His biological mother had untreated health problems and substance abuse problems that may have contributed to his medical condition. At birth, J.C. was placed with a relative, but the relative was unable to provide J.C. with the specialized care that he needed. At a check-up several months after his birth, J.C. weighed less than he had weighed at birth. Soon thereafter, he was taken into the care of the State of Texas, and his parents' rights were terminated.

182.    Ms. Carignan and Ms. Parker first expressed interest in adopting J.C. in April of 2009. The family was approved for the adoption by the State of Texas in or about October of 2009. In January of 2010, both Ms. Carignan and Ms. Parker flew to Texas to meet J.C. in person for the first time, and in March of 2010, Ms. Parker flew to Texas to bring J.C. to their home in Greensboro. From that point forward, J.C. was placed in Ms. Carignan and Ms. Parker's home as a foster child, in a foster-to-adopt capacity, and the adoption of J.C. was finalized approximately one year later.[7]

183.    At the time of J.C.'s placement, he was evaluated to be severely developmentally disabled. At the age of two, he had the mental capacity of a four-month-old, but since arriving in Ms. Carignan and Ms. Parker's home, he has flourished beyond all expectations. While J.C.'s physical disability means that he cannot walk and has limited ability to control his limbs or communicate verbally, he has started to communicate using "eye gaze" communication, and he

---

[7]    J.C.'s adoption decree erroneously reads that he was adopted on April 24, 2011. The correct date is March 24, 2011.

understands a great deal of what he hears. When he was first placed in Ms. Carignan and Ms. Parker's home, J.C. attended an infant/toddler educational program, but he has now progressed to pre-school at a special education school, and Ms. Carignan and Ms. Parker believe he will be able to attend public school for kindergarten as a special needs student.

184.     Ms. Carignan and Ms. Parker both have been found by the state to be suitable parents for J.C.

185.     However, when the time came for J.C. to be legally adopted, only one of the mothers was permitted to do so under North Carolina law. Therefore, despite the fact that both Ms. Carignan and Ms. Parker underwent careful scrutiny in order to become certified as foster parents, and both have committed to share equally in all of their parental responsibilities for the rest of their lives, only Ms. Parker is legally recognized as a parent to their son.

186.     The mothers selected Ms. Parker as the legal parent because her full-time occupation involved caring for individuals with cerebral palsy. They chose to give J.C. Ms. Carignan's last name as a permanent symbol of her role and significance as his second parent.

187.     Since being placed in Ms. Carignan and Ms. Parker's home, J.C. has thrived in the stable, nurturing and loving environment that his parents provide.

188.     Ms. Carignan and Ms. Parker have provided the only supportive and healthy home that J.C. has ever known. J.C. is also loved and embraced by Ms. Carignan's and Ms. Parker's families. Ms. Carignan's and Ms. Parker's families all consider J.C. to be part of the family.

189.     Their loving, supportive and healthy family serves the best interests of J.C.

190.     Under North Carolina's adoption statutes, in order for Ms. Carignan to adopt J.C., Ms. Parker would have to sign away her own parental rights.  Thus, North Carolina law bars both mothers from simultaneously being recognized as legal parents to their son.

191.     Nonetheless, if Ms. Carignan were able to file a petition for a second parent adoption of J.C., and were that petition to be considered pursuant to other existing law and regulation, on information and belief, such a petition would be granted as in the child's best interests.  In fact, because both Ms. Carignan and Ms. Parker already have been determined by the state to be suitable parents for their son, such an outcome is virtually certain.

192.     If Ms. Parker were to die or become incapacitated, Ms. Carignan and Ms. Parker believe it would be in J.C.'s best interests for Ms. Carignan to continue to raise J.C. as his parent.

193.     Absent a legal parent-child relationship with J.C., there is no way to ensure that Ms. Carignan would be legally permitted to do so.

194.     In light of J.C.'s extensive (and often urgent) special needs, Ms. Carignan and Ms. Parker worry that at any particular moment when J.C. might require medical attention, the state or its agents might deny Ms. Carignan the right to make decisions for J.C.

195.     Ms. Carignan and Ms. Parker's worries about being denied the opportunity to remain with J.C. and make decisions for him are based on their actual, traumatic experiences.  In the summer of 2010, J.C. required a surgical procedure at UNC-Chapel Hill to correct a digestive problem that caused him to vomit constantly.  Because Ms. Carignan has no legal parental relationship to J.C., the hospital staff did not permit her to stay past public visiting hours.  As a result, in order to properly care for J.C. and provide him with a family presence at all times, Ms. Parker was forced to remain at the hospital around-the-clock, without the respite or support from Ms. Carignan, J.C.'s other parent.  Likewise, Ms. Carignan was forced to spend evenings

worrying about her son and her partner. Both mothers were distraught about their inability to remain together as a family at a time when their son needed them most.

196. Ms. Carignan and Ms. Parker also worry that if something were to happen to Ms. Parker, the benefits J.C. receives for his medical needs might be interrupted. Ms. Parker receives $545 per month from the State of Texas pursuant to an adoption subsidy agreement, which supports J.C.'s adoption as a special needs placement. J.C. also receives full Medicaid health insurance benefits from the State of North Carolina. Finally, although at one point Ms. Parker received Social Security Insurance payments for J.C. from the State of North Carolina, those payments ceased because North Carolina considered Ms. Carignan's salary as household income, even though Ms. Carignan is not J.C.'s legal parent.

197. The granting of the petition would prevent these plaintiffs from suffering the harms set out in this Complaint.

198. As authorized by the Court on July 30, 2012, Ms. Parker appears in this Action in her capacity as guardian *ad litem* for J.C.

### Leigh Smith, Crystal Hendrix and J.H.-S.

199. Plaintiffs **Leigh Smith** and **Crystal Hendrix** are residents of Asheville, North Carolina. Their family includes plaintiff **J.H.-S.**, who is one year, eight months old.

200. Ms. Smith is thirty-nine years old and grew up in Greensboro; she currently cares for J.H.-S. at home full-time, although she was previously a kindergarten teacher and she hopes someday to return to that profession. Ms. Hendrix is forty-one years old and from western North Carolina; she is currently an elementary school librarian.

201. Ms. Smith and Ms. Hendrix have been a committed couple for eight years and consider themselves life partners. Both women are lifelong North Carolinians.

-42-

202. Ms. Smith and Ms. Hendrix would like to marry one another in North Carolina and thereby achieve the many benefits afforded to married persons in North Carolina. They cannot imagine living anywhere else — both of their extended families live in North Carolina and have lived in North Carolina for generations, and both of them want to be married in North Carolina.

203. Because Ms. Smith and Ms. Hendrix are not permitted to marry in North Carolina, they thereby have been deprived of many of the benefits and subject to many of the deprivations set out in paragraph 322(a)-(q), *infra*.

204. Among other things, because they cannot marry in North Carolina:

a. Ms. Smith and Ms. Hendrix had to go through the cost and effort to have a survivorship clause added to the deed of their house to make sure the house would go to one of them if the other were to die.

b. Ms. Smith and Ms. Hendrix have had to execute health care power of attorney agreements to try to ensure that they can make decisions on one-another's behalf.

c. All of these added legal documents have come at added burden and expense to Ms. Smith and Ms. Hendrix — burden and expense they would not have had if North Carolina permitted them to marry.

205. Ms. Smith and Ms. Hendrix are both passionate educators and have worked on a daily basis with children. They always wanted children of their own. The couple decided that Ms. Hendrix should be the biological mother of J.H.-S.

206. Ms. Smith was involved in all aspects of conceiving J.H.-S. Ms. Smith attended almost every insemination attempt and prenatal appointment, and was present to view ultrasound

pictures, and Ms. Smith and Ms. Hendrix chose J.H.-S's name together. Ms. Smith was present during labor and stood by Ms. Hendrix's side during childbirth.

207. In all respects, J.H.-S. is developing mentally and physically as a healthy, well-adjusted child.

208. Despite the fact that both Ms. Smith and Ms. Hendrix participate equally in all aspects of raising J.H.-S., under North Carolina law, only Ms. Hendrix is recognized as his legal parent.

209. Under North Carolina's adoption statutes, in order for Ms. Smith to adopt J.H.-S., Ms. Hendrix would have to sign away her own parental rights. Thus, North Carolina law bars both mothers from simultaneously being legal parents to their child.

210. Nonetheless, if Ms. Smith were ever able to file a petition for a second parent adoption of J.H.-S., and were that petition to be considered pursuant to other existing law and regulation, on information and belief, such a petition would be granted as in the child's best interests.

211. Ms. Smith and Ms. Hendrix have not yet tried to explain to J.H.-S. the different legal statuses that his mothers hold or the effect of those different statuses and the harms they cause.

212. Ms. Smith and Ms. Hendrix both believe that once J.H.-S. is old enough to understand that his bonds with Ms. Smith are less legally secure, he will experience anxiety and feelings of insecurity about the stability of his family.

213. Although Ms. Smith and Ms. Hendrix have undertaken efforts to ensure that each will be able to continue life with minimum legal disruption if the other were to die or become

-44-

incapacitated, and to avoid the harms that the statutory adoption scheme causes to their family, such steps cannot give their family the full protection of legal parentage.

214.    If Ms. Hendrix were to die or become incapacitated, Ms. Smith and Ms. Hendrix believe that it would be in J.H.-S.'s best interests for Ms. Smith to continue to raise him as his parent.

215.    Absent a legal parent-child relationship with J.H.-S., there is no way to ensure that Ms. Smith would be legally permitted to do so.

216.    Because of the uncertain legal relationship between Ms. Smith and J.H.-S., both mothers worry that if something were to happen to Ms. Hendrix, Ms. Smith's relationship with J.H.-S. could be jeopardized by legal challenges to her parentage, either by the state or by Ms. Hendrix's family.

217.    Ms. Hendrix's parents do not accept Ms. Smith, and do not recognize her as J.H.-S's second parent.  As a result, both Ms. Smith and Ms. Hendrix are concerned that if Ms. Hendrix were to die or become incapacitated, her parents would attempt to interfere with Ms. Smith's custody of J.H.-S.

218.    The granting of the petition would prevent these plaintiffs from suffering the harms set out in this Complaint.

219.    As authorized by the Court on July 30, 2012, Ms. Hendrix appears in this Action in her capacity as guardian *ad litem* for J.H.-S.

### Dana Draa, Lee Knight Caffery, M.M.C.-D. and M.L.C.-D.

220.    Plaintiffs **Ms. Dana Draa** and **Lee Knight Caffery** are residents of Charlotte, North Carolina.  They have two children:  plaintiffs **M.M.C.-D.** and **M.L.C.-D.**, who are four years old and nineteen months old, respectively.

221. Ms. Draa is forty-two years old and currently works for the Veterans Administration assisting blind and visually impaired veterans. Ms. Draa is herself a veteran of the United States Navy; she spent eight months in the Middle East as part of Operation Desert Storm during the Gulf War and served in the Alaska National Guard. Ms. Caffrey is thirty-eight years old and is an attorney.

222. Ms. Draa and Ms. Caffrey have been a committed couple for eight years and had a formal commitment ceremony on May 19, 2007. They think of that ceremony as their wedding because it was a show of love and commitment in front of their family and friends. They had a reception and a band for about eighty people and exchanged rings that day, which they mark as their anniversary.

223. Ms. Draa and Ms. Caffrey would like to marry one another in North Carolina and thereby achieve the many benefits afforded to married persons in North Carolina. Ms. Draa and Ms. Caffrey believe that marriage is the acknowledgement that their family is like other families. For their children's sake, they hope to have their relationship formalized in the eyes of the State of North Carolina.

224. Because Ms. Draa and Ms. Caffrey are not permitted to marry in North Carolina, they thereby have been deprived of many of the benefits and subject to many of the deprivations set out in paragraph 322(a)-(q), *infra*.

225. Because Ms. Draa and Ms. Caffrey are not permitted to marry in North Carolina:

a. Ms. Caffrey is not covered under a health insurance policy through Ms. Draa's employer.

b. Ms. Caffrey and Ms. Draa have tried their best to protect their family through contractual provisions, including wills and power of attorney forms, but they are

-46-

concerned that those contractual relationships may not deal with all circumstances that may arise or be recognized to the same extent as if they were married in North Carolina.

    c.  Ms. Caffrey would be denied the benefits offered to spouses of veterans if Ms. Draa died, including financial support and the ability to be buried in a VA cemetery. Furthermore, if Ms. Draa ever became disabled due to her military service, Ms. Caffrey would be denied spousal disability benefits.

    d.  Ms. Caffrey and Ms. Draa worry that their children will be bullied or ridiculed because the state has said they are prohibited from marrying and relegated their relationship to one less worthy than those of heterosexual couples.  They also fear that their children will feel their family is inferior as a result of Amendment One.

226.    Ms. Draa and Ms. Caffrey both always wanted children of their own, and initially discussed whether to adopt children or have their own biological children.  They decided together that Ms. Caffrey would be the birth mother of their children.

227.    Ms. Draa was involved in all aspects of conceiving their children.  Ms. Draa attended almost every insemination attempt and prenatal appointment, and the couple chose the children's names together.  Ms. Draa was present during labor and stood by Ms. Caffrey's side during the birth of both children.

228.    In all respects, both children are developing mentally and physically as healthy, well-adjusted children.

229.    Ms. Draa and Ms. Caffrey have provided the only home that M.M.C.-D. and M.L.C.-D. have ever known.  Both M.M.C.-D. and M.L.C.-D. call Ms. Draa "Mama D" or "Ma D," and call Ms. Caffrey "Mom" or "Mum."  The children have hyphenated last names to,

among other reasons, decrease the likelihood that strangers who are unfamiliar with their family situation will challenge Ms. Draa's rights as a parent.

230. Their loving, supportive and healthy family serves the best interests of M.M.C.-D. and M.L.C.-D.

231. Despite the fact that both Ms. Draa and Ms. Caffrey participate equally in all aspects of raising their children, under North Carolina law, only Ms. Caffrey is recognized as a legal parent to M.M.C.-D. and M.L.C.-D.

232. Under North Carolina's adoption statutes, Ms. Draa could only adopt M.M.C.-D. and M.L.C.-D. if Ms. Caffrey signed away her own parental rights. Thus, North Carolina law bars both mothers from simultaneously being recognized as legal parents to their children.

233. Nonetheless, if Ms. Draa were able to file a petition for a second parent adoption of M.M.C.-D. and M.L.C.-D., and were that petition to be considered on the merits and evaluated pursuant to law and regulation, such a petition would be granted as in the children's best interests.

234. Ms. Draa and Ms. Caffrey have not yet tried to explain to their children the different legal statuses that their mothers hold or the effect of those different statuses and the harms they cause.

235. Ms. Draa and Ms. Caffrey both believe that when the children understand that their bonds with Ms. Draa are less legally secure, they will experience anxiety and feelings of insecurity about the stability of their family.

236. Although Ms. Draa and Ms. Caffrey have undertaken efforts to ensure that each will be able to continue life with minimum legal disruption if the other were to die or become

incapacitated, and to avoid the harms that the statutory adoption scheme causes to their family, such steps cannot give their family the full protection of legal parentage.

237.    Because of the uncertainty inherent in the status of a second parent in North Carolina, Ms. Draa and Ms. Caffrey live with constant anxiety about what would happen to the boys if Ms. Caffrey were to die or become incapacitated.

238.    If Ms. Caffrey were to die or become incapacitated, both Ms. Draa and Ms. Caffrey believe that it would be in the children's best interests for Ms. Draa to continue to raise the children as their parent.

239.    Absent a legal parent-child relationship between Ms. Draa and the children, there is no way to ensure that she would be legally permitted to do so.

240.    Because of the uncertainty inherent in the status of Second Parents in North Carolina, both mothers worry that if something were to happen to Ms. Caffrey, there is the real possibility that Ms. Draa's parental status or guardianship might be challenged.

241.    The granting of the petition would prevent these plaintiffs from suffering the harms set out in this Complaint.

242.    As authorized by the Court on July 30, 2012, Ms. Caffrey appears in this Action in her capacity as guardian *ad litem* for M.M.C.-D. and M.L.C.-D.

**Shawn Long, Craig Johnson, and I.J.-L.**

243.    Plaintiffs **Craig Johnson** and **Shawn Long** are native North Carolinians from Garner and Bushy Fork, respectively, and they currently reside in Wake Forest.  Their son, plaintiff **I.J.-L.**, is eleven years old.

244.    Mr. Johnson and Mr. Long have been in a committed same-sex relationship for nineteen years.  Mr. Johnson is forty-six years old and is a clinical program assistant at a

pharmaceutical company. Mr. Long is forty-three years old and is an administrative coordinator at a non-profit organization.

245. Mr. Johnson and Mr. Long would like to marry one another in North Carolina and thereby achieve the many benefits afforded to married persons in North Carolina.

246. Mr. Johnson and Mr. Long believe that marriage is the ultimate culmination and recognition of having a family.

247. They want to marry in North Carolina — they do not want to travel to another state to marry and then return to North Carolina because, as Mr. Johnson put it, it would feel "like being dead and alive at the same time." They both wear rings and mark June 4, 1994 as their anniversary, but they are waiting for marriage to be legal in North Carolina to have a ceremony. They call one another "partner" but if legally married would use the term "husband."

248. Their son, I.J.-L., understands that his parents are not married, but he wants them to be. He asks them, "When will it be legal?" He has asked what Amendment One means and why it was passed and Mr. Johnson and Mr. Long used it as a "teaching moment." I.J.-L. understands that gay couples can marry in other states and is hurt to know that his parents cannot marry in their home state.

249. Because they are not permitted to marry under the laws of the State of North Carolina, Mr. Johnson and Mr. Long have been deprived of many of the benefits and subject to many of the deprivations set out in paragraph 322(a)-(q), *infra*.

250. Among other things, because they are not permitted to marry under the laws of the State of North Carolina:

a. Mr. Long and Mr. Johnson pay more taxes than they otherwise would. Although Mr. Johnson's employer provides domestic partner benefits, their health benefits are taxable at a higher rate than they would be if they were married.

b. Whenever they take I.L.-J. to a doctor or dentist, they always need more paperwork — both to prove who they are and to prove who he is in relation to them.

c. Mr. Long and Mr. Johnson worry about how they will be affected by North Carolina inheritance laws should one of them die.

d. They also fear negative treatment in emergency situations, for example, when Mr. Johnson had to go to the emergency room, Mr. Long worried that he would not be admitted to be by Mr. Johnson's side because they are not legally related.

251. When Mr. Johnson and Mr. Long decided to start a family, they wanted to give a loving home to an older child and chose to pursue adoption through the foster care system. They chose Mr. Johnson to be the adoptive parent because he had parents and extended family nearby.

252. I.J.-L.'s mother gave birth to him at age sixteen. I.J.-L. was placed in temporary foster care at an early age, and when he was returned to his mother's home, his grandmother was responsible for his care. After further neglect, I.J.-L. was hospitalized for malnutrition and placed into a therapeutic foster home. He was four years old at the time.

253. By the time I.J.-L. joined Mr. Johnson and Mr. Long's family at five years old, he had already experienced severe trauma due to neglect and abuse.

254. In order for Mr. Johnson and Mr. Long's household to become certified as a foster home under North Carolina law, both men were required to undergo the same extensive training, education, and scrutiny.

255.     For basic foster parenting certification, Mr. Johnson and Mr. Long attended approximately thirty hours of parenthood training, spread out over many weeks and weekends.

256.     In addition to attending classes and parenting workshops, both Mr. Johnson and Mr. Long underwent extensive background checks, as well as several home inspections — including fire and safety inspections, social work inspections and interviews in conjunction with home visits from social workers — that evaluated the overall fitness of their home for foster children.

257.     Throughout this process, officials employed by DSS and the family services agency assisting their effort to become adoptive parents were fully aware that Mr. Johnson and Mr. Long were in a committed relationship.

258.     Mr. Johnson and Mr. Long were both approved and licensed as foster parents in 2006.

259.     Mr. Johnson and Mr. Long expressed a preference to foster and ultimately adopt a child who was older than an infant, and up to ten years old.

260.     I.J.-L. was placed with Mr. Johnson and Mr. Long in 2007.

261.     Mr. Johnson and Mr. Long have both been found by the state to be suitable parents for I.J.-L.

262.     Despite this fact, and despite the fact that Mr. Johnson and Mr. Long underwent the same careful scrutiny in order to become certified as foster parents, only one of the fathers was permitted to legally adopt I.J.-L. as a matter of North Carolina law.  Thus, while both Mr. Johnson and Mr. Long have committed to share equally in all of their parental responsibilities for the rest of their lives, only Mr. Johnson adopted I.J.-L. in 2008, and only he is legally recognized as a parent to I.J.-L.

263.     Since being placed in Mr. Johnson and Mr. Long's home, I.J.-L. has thrived in the stable, nurturing and loving environment that his parents and his loving extended families provide.  I.J.-L. is in better physical health and performs better in school since coming to live with Mr. Johnson and Mr. Long.

264.     Mr. Johnson and Mr. Long's home and their family serve the best interests of their child.

265.     I.J.-L. considers both Mr. Johnson and Mr. Long to be his equal parents.  He calls Mr. Johnson "Dad" and Mr. Long "Pa."

266.     Under North Carolina's adoption statutes, in order for Mr. Long to become a legal parent to I.J.-L. through adoption, Mr. Johnson would be required to sign away and terminate all of his own parental rights.  Thus, North Carolina law bars both fathers from simultaneously being recognized as legal parents to I.J.-L.

267.     Mr. Johnson and Mr. Long both worry that when I.J.-L. understands that his bond with Mr. Long is less legally secure, he will experience anxiety about the possibility of losing yet another parent.

268.     Nonetheless, if Mr. Long were ever permitted to file a petition for a second parent adoption of I.J.-L., and were that petition to be considered on the merits and evaluated pursuant to other existing law and regulation, on information and belief, such a petition would be granted as in the child's best interests.  In fact, because both Mr. Long and Mr. Johnson already have been determined by the state to be suitable parents for I.J.-L., such an outcome is virtually certain.

269.     If Mr. Johnson were to die or become incapacitated, both Mr. Johnson and Mr. Long believe it is in I.J.-L.'s best interests for Mr. Long to continue raising the boy as his parent.

270.      Absent a legal relationship with I.J.-L., there is no way for Mr. Long to ensure that he would be legally permitted to do so.

271.     Both men therefore live with constant anxiety about what would happen to I.J.-L. if Mr. Johnson were to die or become incapacitated.

272.     Mr. Long and Mr. Johnson also worry that if I.J.-L. were to get injured at school or sports practice and need urgent medical care, Mr. Long would not be allowed to make medical decisions for his son.

273.     If Mr. Johnson did pass away, I.J.-L. would have no legal parent for an undetermined period of time.

274.     During the time that Mr. Johnson and Mr. Long were fostering I.J.-L., their household received a foster care subsidy from the state.  Mr. Johnson continues to receive an adoption subsidy as the boy's legal parent.

275.     On information and belief, Mr. Long would not be allowed to collect the adoption subsidy unless he could become I.J.-L.'s legal parent.

276.     Both the foster care subsidy and the adoption subsidy exist to encourage and support families that provide homes to children in need.

277.     Mr. Johnson and Mr. Long rely on the subsidy in parenting I.J.-L., and worry that if something were to happen to Mr. Johnson, the subsidy would not continue and their son would be harmed by the additional deprivation of an important benefit to which he is otherwise entitled under North Carolina law.

-54-

278.    The granting of the petition would prevent these plaintiffs from suffering the harms set out in this Complaint.

279.    As authorized by the Court on July 30, 2012, Mr. Johnson appears in this Action in his capacity as guardian *ad litem* for I.J.-L.

\* \* \*

280.    As a group, Marcie and Chantelle Fisher-Borne, Terry Beck, Shana Carignan, Leigh Smith, Dana Draa and Shawn Long are all referred to collectively as the "Second Parent Plaintiffs."

281.    As a group, Marcie and Chantelle Fisher-Borne, Leslie Zanaglio, Megan Parker, Crystal Hendrix, Lee Knight Caffery and Craig Johnson are all referred to collectively as the "Legal Parent Plaintiffs."

282.    As a group, M.F.-B., E.F.-B., T.B.Z., D.B.Z., J.C., J.H.-S., M.M.C.-D., M.L.C.-D. and I.J.-L. are all referred to collectively as the "Child Plaintiffs."

### HARMS SUFFERED BY PLAINTIFFS AS A RESULT OF NORTH CAROLINA'S CATEGORICAL PROHIBITION AGAINST SECOND PARENT ADOPTION

283.    Legal recognition of a parent-child relationship gives rise to numerous benefits for both the child and the parent that are not available otherwise.

284.    Legal recognition of the parent-child relationship provides rights, benefits, privileges and entitlements that may come from federal, state, local or private sources.

285.    Legal recognition also increases the strength and stability of the parent-child bond and enhances the security of the relationship.

286.    Legal recognition of the parent-child bond strengthens the whole family.

287.     Legal recognition of the parent-child bond ensures that the child and surviving parent will remain together even in the event of death or incapacity of one legal parent, or in the unlikely event that a child's two parents separate.

288.     Plaintiffs' families are harmed and made less secure by North Carolina's prohibition on second parent adoption, and they suffer injury as a result of being deprived of protections they otherwise would receive but for North Carolina's prohibition.

289.     The Child Plaintiffs suffer direct and immediate harm as a result of defendants' categorical rejection of any petition for second parent adoption and are denied many public and private rights and privileges that flow from a legally recognized parent-child relationship, including the benefits set out below.

290.     For example, under North Carolina law, only a legal parent can consent to medical treatment for a minor child. *See* N.C. Gen. Stat. § 90-21.1.  Even when a Second Parent Plaintiff holds a power of attorney permitting him or her to make decisions on behalf of the Legal Parent Plaintiff, a medical care provider could rely on the plain language of N.C. Gen. Stat. § 90-21.1 and either refuse to permit that second parent from making important medical decisions concerning one of the Child Plaintiffs, or refuse to permit a Second Parent Plaintiff from remaining with one of the Child Plaintiffs during a medical procedure or medical emergency — a time when the child needs his or her parents most.

291.     Serious harm to a child can result at any moment if one of his or her parents and caretakers is unable to give instructions to health care providers or consent to emergency medical treatment.

292.     The potential for immediate harm is especially acute for plaintiff J.C. who suffers from a complicated and chronic medical condition.  As the incident described in paragraph 195

makes clear, J.C.'s second parent has been denied the ability to remain with her son in the past, and there exists a concrete and real probability that this may occur again in the future.

293.    In addition, through the federal Social Security Insurance program, upon the death of a qualifying wage-earner, a surviving spouse and/or dependent legal child or children can collect survivor benefits that generally equal between 150% and 180% of the deceased family member's Social Security benefit amounts.

294.    Survivor benefits under the Social Security program are available to legal spouses and children, or other dependents with a legally formalized relationship to the decedent. They are not available between family members like those here, who do not have a formal legal relationship between one of the parents and his or her child.

295.    Under the Social Security Insurance program, Child Plaintiffs are currently unable to collect survivor benefits, and other federal government benefits that are available to legal children whose parents become disabled or retire, from their second parents.

296.    Under North Carolina law, children of an injured employee may claim the parent-employee's compensation payments in the event of that parent's death. *See* N.C. Gen. Stat. § 97-39. North Carolina defines "child" to include "a child legally adopted prior to the injury of the employee." N.C. Gen. Stat. § 97-2.12.

297.    Because the Child Plaintiffs cannot be adopted by their second parents, the Child Plaintiffs would be ineligible to collect these worker compensation benefits if their second parent dies.

298.    Under North Carolina intestacy law, the property of a deceased parent passes to biological children or adopted children. *See* N.C. Gen. Stat. §§ 29-16, 29-17. North Carolina

intestacy law makes no provision for property to pass from a deceased parent to a non-legal child.

299.   Because the Child Plaintiffs cannot be adopted by their second parents, the Second Parent's property would not pass to the Child Plaintiffs if their second parent dies intestate or has his or her will declared invalid.

300.   This problem is magnified because intestacy laws affect inheritances on a spectrum of relatives, including grandparents, aunts and uncles.  The Child Plaintiffs are also therefore ineligible to inherit, through intestacy law, from grandparents and other relatives of their second parents.  While it may be burdensome for Second Parent Plaintiffs to carry papers such as powers of attorney with them at all times, it is virtually impossible for them to ensure that various relatives maintain and update their wills.

301.   Similarly, a Child Plaintiff would be ineligible to be a beneficiary of trusts put in place by parents of his or her second parent (i.e., non-legal grandparents) or other family members of the second parent who died before ever knowing that the Child Plaintiff would become part of their family through the Second Parent Plaintiff, if the writings governing those trusts conferred benefits upon "issue," "grandchildren," or were not otherwise specifically drafted to contemplate a bequest to Child Plaintiffs.

302.   Under North Carolina law, damages from an action brought for wrongful death flow to a decedent's estate and are distributed to the beneficiaries of that estate.  *See* N.C. Gen. Stat. §§ 28A-18-2.  Because the Child Plaintiffs cannot be adopted by their second parents, should a wrongful death action be brought by the estate of the second parent, the Child Plaintiffs would not be deemed beneficiaries of any damages from such action.

303. The State of North Carolina provides an adoption subsidy to support parents who adopt children from foster care. Other states provide similar incentives to encourage adoption, in part because adoption provides such significant financial savings to the state over congregate care, and because of a policy determination that permanent placements with families are better for children than remaining in the custody of the state.

304. Among those families with children who were adopted from state foster care, if the Legal Parent Plaintiff were to die or become incapacitated, in addition to losing that parent's wage income, the Child Plaintiffs, specifically J.C., T.B.Z., D.B.Z. and I.J.-L., would lose the financial support through the adoption subsidy.

305. For those harms described in paragraphs 283 through 304 that depend on future events, there is no action that the plaintiffs can take to cure (or even mitigate) those harms once those future events have occurred. These harms would then be immediate and irremediable.

306. For example, some of the harms described in paragraphs 283 through 304 are precipitated by the death of the Second Parent Plaintiff. Once dead, a Second Parent Plaintiff will never be able to formalize a legal parent-child relationship with the Child Plaintiff through second parent adoption or otherwise. Thus, any benefits to which a Child Plaintiff would have been entitled had the Child Plaintiff been legally adopted by his or her second parent will be irretrievably lost to the Child Plaintiff at the moment of the Second Parent Plaintiff's death.

307. In addition to being deprived of rights and benefits, the plaintiff families also suffer emotional harm and fear as a result of North Carolina's ban on second parent adoption.

308. Once the Child Plaintiffs are old enough to understand that they do not have a legal relationship with one parent, upon information and belief, they will suffer anxiety from the uncertainty that accompanies that lack of legal relationship.

309.    For example, when the Child Plaintiffs are old enough to understand the differences in the legal statuses of their parents, the Child Plaintiffs will face uncertainty regarding where they will live, or with whom they will live, should their legal parent die or become incapacitated.  The anxiety that the Child Plaintiffs will suffer as a result of the lack of legal relationship with both their parents will be especially aggravated for the Child Plaintiffs who have already suffered displacement and relocation from their biological families.

310.    As a result of the deprivations described in this Action, the Parent Plaintiffs forego opportunities and experiences for the Child Plaintiffs that their families would otherwise consider, including limiting their travel to geographic regions that will recognize the legitimacy of their family relationship, limiting their schooling options to those schools that respect their family structure, limiting their choice of medical care providers to those that would respect the rights of the Second Parent, and being forced to carry copies of many (potentially legally insufficient) legal documents whenever traveling.

311.    Both the Legal and the Second Parent Plaintiffs face currently present and continuing psychological suffering and injury, including acute anxiety and worry, because they know that if the Legal Parent were to die or become incapacitated, the ability of the Second Parent to continue caring for the child would be subject to challenge precisely at the time when the child or children would be most vulnerable and emotionally fragile, and most in need of continuing stability in their domestic life.

312.    The harms to the Second Parent Plaintiffs range from the mundane — being unable to consent to school activities for their children — to the life-threatening — being unable to consent to medical treatment, to the emotional — feeling that their parental role is less legitimate because it is not legally recognized by the state.

313. Conversely, the Legal Parent Plaintiffs are harmed by having all legal responsibility fall on their shoulders, and they are deprived of the joy of sharing legal parentage with their partner and co-parent. They share in all aspects of raising their children with the Second Parent Plaintiffs, but in the eyes of the law, only the Legal Parent Plaintiffs are responsible for decision-making and support of the children.

314. The Legal Parent Plaintiffs would like to share legal responsibility for their children with the Second Parent Plaintiffs, and know it is in the best interest of their children to do so. By categorically prohibiting the Second Parent Plaintiffs from formalizing their relationships with the Child Plaintiff, North Carolina prevents the Legal and Second Parent Plaintiffs from fully asserting parental authority and responsibility to act in the best interests of their children.

315. To the extent any of the harms set forth in this Complaint can be ameliorated by taking other steps and means that need not be taken by stepparents who can petition to adopt, such steps and means are more costly and do not cure the harms set forth in this Complaint.

316. For example, in order to protect their children, some Legal and Second Parent Plaintiffs have spent thousands of dollars on attorneys' fees to pay for the creation of legal documents that attempt to bring legal security to some aspects of the parent-child relationship between the Second Parent Plaintiffs and the Child Plaintiffs. These documents, however, do not and cannot create legal parentage.

317. Similarly, the Legal and Second Parent Plaintiffs have spent hundreds of hours of their own time navigating the legal, administrative, and personal hurdles that are created by the lack of legal recognition for the Second Parent Plaintiffs, and managing the process of creating and defending inferior legal structures to protect their families' rights and privileges.

318. The effects of the harms set out above are current and real, as they affect planning, budgets and other current and real financial decisions. Such denials also cause current psychological and emotional harm that would not arise but for North Carolina law.

## HARMS SUFFERED BY PLAINTIFFS
## AS A RESULT OF BEING DENIED THE FREEDOM TO MARRY

319. Plaintiffs are harmed in numerous ways by the exclusion of same-sex couples from the freedom to marry in North Carolina.

320. Marriage plays a unique and central social, legal and economic role in American society. Being married reflects the commitment that a couple makes to one another, as well as representing a public acknowledgement of the value, legitimacy, depth and permanence of the married couple's private relationship. Marriage is the sole legal institution in North Carolina through which couples can create a complete family unit that the state recognizes and protects.

321. Conversely, denial to some couples of the status of being married in the eyes of the state conveys the state's view that the couple's private relationship is of lesser value and unworthy of legal recognition and support. This public rejection of what is among the Parent Plaintiffs' most significant relationships damages them and their children, invites and facilitates private discrimination against them, and promotes the view that their relationships and families are inferior to those of other committed couples.

322. By preventing same-sex couples from marrying and refusing to recognize their marriages from other states, Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2 deprive same-sex couples of numerous legal protections that are available to opposite-sex couples in North Carolina by virtue of their marriages. By way of example only:

    a. In North Carolina, both parties to a married couple may jointly petition to be an adoptive parent. N.C. Gen. Stat. § 48-2-301(b). Same-sex couples are prohibited

from jointly filing a petition for adoption, because North Carolina law prohibits any other person from joining an unmarried person's adoption petition. N.C. Gen. Stat. § 48-2-301(c).

b.   If a heterosexual married person becomes incapacitated without a health care power of attorney or guardian, his or her spouse is first authorized to make decisions regarding the spouse's care. *See* N.C. Gen. Stat. § 90-322(b). A same-sex partner's parents, children and siblings are consulted first. The same-sex partner would only be consulted after these individuals and would be subjected to requirements not placed on the spouse, parent, children or sibling. *See id.*

c.   In North Carolina, a spouse cannot be compelled to disclose confidential communications made by one to another during their marriage. N.C. Gen. Stat. § 8-57(c). The same privilege does not protect the communications of same-sex spouses or partners.

d.   Married students are eligible for larger loans under the Scholarship Loan Fund for Prospective College Teachers. N.C. Gen. Stat. § 116-73(2). Students with a same-sex spouse or partner would receive a smaller loan.

e.   A nonresident military spouse with a valid driver's license in another state who is residing in North Carolina because of military orders is not required to maintain a North Carolina license. N.C. Gen. Stat. § 20-8. A same-sex spouse or partner would be required to obtain a North Carolina license.

f.   The North Carolina Constitution provides that a heterosexual married couple's home shall remain exempt from a spouse's debts even after the spouse's death. *See* N.C.

Const. Art. X, Sec. 2. The death of a same-sex spouse or partner would subject the property to creditors.

g. A surviving spouse is the first person who may authorize the type, method, place and disposition of the body of a decedent spouse who did not have a will. N.C. Gen. Stat. § 130A-420(b)(1). A surviving same-sex spouse or partner could only do so after the decedent's children, parents, siblings, grandchildren, great-grandchildren, great-great grandchildren, nieces, nephews, grandnephews, grandnieces, uncles, aunts, children of aunts and uncles, grandchildren of aunts and uncles, and grandparents are first consulted. *See* N.C. Gen. Stat. §§ 130A-420(b)(5), 29-15.

h. Under the North Carolina Workers' Compensation Act, a heterosexual surviving spouse is entitled to receive benefits under the Act. N.C. Gen. Stat. §§ 97-2, 97-39. A same-sex spouse or partner is not entitled to any benefits.

i. A surviving spouse in North Carolina is entitled to receive up to one-half of the property of the decedent who passes without a will. N.C. Gen. Stat. § 29-14(4). A same-sex spouse or partner would receive nothing.

j. Surviving spouses in North Carolina also receive a number of benefits even if the dying spouse had a will that does not provide such benefits. For instance, a surviving spouse is entitled to one-half of the community property of the couple. N.C. Gen. Stat. § 31C-3. A surviving spouse also has a right to an elective share of up to one-half the total assets of the decedent or a one-third life estate in all of the decedent's real estate holdings. N.C. Gen. Stat. §§ 29-30, 30-3.1. A surviving spouse is entitled to a year's allowance of up to $20,000. N.C. Gen. Stat. § 30-15. These benefits are not available to same-sex spouses or partners.

-64-

k.   Disabled veterans and their surviving spouses receive property tax exclusions under North Carolina law.  *See* N.C. Gen. Stat. § 105-277.1C.  These exclusions are not available to same-sex surviving spouses or partners.

l.   Spouses of members of the North Carolina National Guard receive the pension and benefits of a member who dies in service.  N.C. Gen. Stat. § 127A-108.  A surviving same-sex spouse or partner does not.

m.   Surviving spouses of North Carolina law enforcement officers, firefighters and other first responders killed in the line of duty receive up to $70,000 of financial assistance.  N.C. Gen. Stat. § 143-166.3.  This assistance is not provided to same-sex spouses or partners.

n.   A number of special license plates are available to surviving spouses of qualifying members, such as Prisoner of War, Retired Law Enforcement Officer and Retired State Highway Patrol.  N.C. Gen. Stat. § 20-79.4(b)(167), (174), (176).  Surviving same-sex spouses or partners are not eligible for license plates recognizing their loved one's sacrifice.

o.   Surviving spouses of members of the North Carolina State, city and county law-enforcement agencies killed in the line of duty receive the badge worn or carried by the decedent.  N.C. Gen. Stat. § 20-187.2.  Same-sex spouses or partners would not receive this automatic emblem of their partner's service.

p.   A surviving spouse is entitled to refunds of certain overpayment of income tax by the decedent spouse.  N.C. Gen. Stat. § 28A-15-8.  The same refund is not provided to same-sex spouses or partners.

q.  North Carolina laws promote the stability of marriages through rules such as a year-long mandatory waiting period prior to divorce.  N.C. Gen. Stat. § 50-6.  The divorce laws, including these provisions, do not apply to same-sex spouses or partners.

323.    Same-sex couples are excluded from these and many other legal protections provided for married couples under North Carolina law.

324.    The exclusion of same-sex couples from marriage also denies them eligibility for numerous federal protections afforded to married couples including in the areas of immigration and citizenship, taxes and social security.  Some of these federal protections for married couples are only available to couples if their marriages are legally recognized in the state in which they live.  *See, e.g.*, 42 U.S.C. § 416(h)(1)(A)(i) (marriage for eligibility for social security benefits based on law of state where couple resides at time of application); 29 C.F.R. § 825.122(b) (same for Family Medical Leave Act).  Thus, even the Married Plaintiffs cannot access such protections as long as North Carolina refuses to recognize their marriages.

325.    The exclusion from marriage also harms same-sex couples and their families in many other ways.

326.    Excluding same-sex couples from marriage also harms couples and their children by denying them the social recognition that comes with marriage.  Marriage has profound social significance both for the couple that gets married and the family, friends and community that surround them.  The terms "married" and "spouse" have universally understood meanings that command respect for a couple's relationship and the commitment they have made.

327.    The exclusion from the esteemed institution of marriage demeans and stigmatizes lesbian and gay couples and their children by sending the message that they are less worthy and valued than families headed by married opposite-sex couples.

328.     The impact of the exclusion from marriage on same-sex couples and their families is extensive and real.  The denial of the freedom to marry causes these couples and their families to suffer significant emotional, physical and economic harms.

329.     The plaintiff couples recognize that marriage entails both benefits to and obligations on the partners and they welcome both.

## DEFENDANTS

330.     Defendant John W. Smith is the Director of the North Carolina Administrative Office of the Courts ("AOC"), which, on information and belief, has the responsibility for promulgating rules, policies and procedures to control or advise North Carolina clerks of county courts who apply the North Carolina adoption laws when considering whether to accept or reject petitions for adoption.

331.     In particular, the AOC has the responsibility and authority to instruct the Clerks of the Superior Court in the 100 counties of North Carolina regarding proper and lawful application of North Carolina law.

332.     He and his successors are sued in their official capacity only.

333.     Defendant David L. Churchill is the Clerk of the Superior Court for Guilford County.  In that capacity, he is entrusted with the authority to carry out certain laws of the state, including the adoption statutes described herein.

334.     Specifically, Defendant Churchill presides over adoption proceedings in Guilford County, adjudicating individual petitions for adoption and ultimately deciding whether any particular adoption is in the best interests of the child.

335.     Defendant Churchill and his successors are sued in their official capacity only.

336. Defendant Archie L. Smith is the Clerk of the Superior Court for Durham County, North Carolina. In that capacity, he is entrusted with the authority to carry out certain laws of the state, including the adoption statutes described herein.

337. Specifically, Defendant Smith presides over adoption proceedings in Durham County, adjudicating individual petitions for adoption and ultimately deciding whether any particular adoption is in the best interests of the child.

338. Defendant Smith and his successors are sued in their official capacity only.

339. Defendant Roy Cooper is the Attorney General of North Carolina. In that capacity, it is his duty to appear for the State in any court or tribunal in any cause or matter, civil or criminal, in which the State may be a party or interested. N.C. Gen. Stat. § 114-2. It is the duty of Defendant Cooper to defend and enforce the laws of North Carolina.

340. Additionally, in that capacity, and among other relevant opinions, Defendant Cooper has advised that "a register of deeds would violate North Carolina law in issuing a marriage license to persons of the same gender. If, in issuing such a license, the register of deeds operates in bad faith he may subject himself to [certain civil and criminal] penalties . . . ." Re: Advisory Opinion: Issuance of Marriage Licenses to Individuals of Same Gender; Penalties, N.C. Op. Att'y Gen., 2004 WL 871437.

341. Defendant Cooper and his successors are sued in their official capacity only.

342. Defendant William Covington is the Register of Deeds for Durham County. In that capacity, he is entrusted with the authority to carry out certain laws of the state, including the issuance of marriage licenses and certificates.

343. Specifically, Defendant Covington presides over applications for marriage licenses, deciding whether a license should be granted.

-68-

344.     Defendant Covington and his successors are sued in their official capacity only.

345.     Defendant Jeff Thigpen is the Register of Deeds for Guilford County.  In that capacity, he is entrusted with the authority to carry out certain laws of the state, including the issuance of marriage licenses and certificates.

346.     Specifically, Defendant Thigpen presides over applications for marriage licenses, deciding whether a license should be granted.

347.     Defendant Thigpen and his successors are sued in their official capacity only.

348.     Defendants' actions constitute actions under color of law.

<div align="center"><strong><u>FUTILITY</u></strong></div>

349.     The Second Parent Plaintiffs are categorically excluded from consideration for a second parent adoption and for marriage by the laws of North Carolina.

350.     Under North Carolina law, as definitively interpreted by the North Carolina Supreme Court, the courts of North Carolina have no jurisdiction to hear such a petition for a second parent adoption.  *See Boseman* v. *Jarrell*, 704 S.E.2d 494, 501 (N.C. 2010).

351.     Amendment One bars each of the plaintiffs from marrying their spouse in North Carolina or having their out of state marriage recognized in North Carolina.  *See also* N.C. Gen. Stat. §§ 51-1, 51-1.2.

352.     Defendants David L. Churchill, Archie L. Smith, other Clerks of the Superior Court, the Attorney General, and Defendants William Covington, Jeff Thigpen, and other Registers of Deeds are required to follow the laws of the State of North Carolina cited in this Action as definitively interpreted by the North Carolina Supreme Court.

353.     A Clerk of the Superior Court following North Carolina law necessarily would reject any petition for a second parent adoption filed by any of the Second Parent Plaintiffs in this case.

354.    The Registers of Deeds following North Carolina law necessarily would reject any application for marriage submitted by any of the adult unmarried Plaintiffs.

355.    The Legal and Second Parent Plaintiffs in this case have not yet sought a second parent adoption for their children, the Child Plaintiffs in this case.

356.    The Second Parent Plaintiffs, together with the Legal Parent Plaintiffs, intend to seek, and would seek, a second parent adoption, were such adoptions available.

357.    Because the laws of the State of North Carolina, as definitively interpreted by the North Carolina Supreme Court, categorically prohibit second parent adoption under the circumstances described above, it would be futile for the Second Parent Plaintiffs to seek a second parent adoption.

358.    The unmarried adult plaintiffs intend to seek, and would seek to marry were marriage available to them, and the Married Plaintiffs would seek recognition of their marriage under North Carolina laws were such recognition available.

359.    Because the laws of the State of North Carolina categorically prohibit gays and lesbians from marrying or the State recognizing out-of state marriages of gay and lesbian persons, it would be futile for the adult plaintiffs to seek to marry or have their out-of-state marriages recognized in North Carolina.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### (BY THE CHILD PLAINTIFFS)
#### (CHILDREN'S RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983)

360.    Plaintiffs repeat and reallege paragraphs 1 to 359 as if set forth in full.

361.    North Carolina's categorical refusal to permit applications for second parent adoption petitions by same-sex couples and evaluate those petitions in accordance with other existing law and regulations creates an absolute barrier to creating a legal parent-child relationship with both parents, and is unconstitutional on its face and as applied to the Child Plaintiffs because it discriminates against the Child Plaintiffs on the basis of their parents' sexual orientation and/or sexual orientation and marital status.

362.    Specifically, the state's refusal does not permit the Child Plaintiffs to secure the benefits of a legal parent-child relationship that would inure to similarly situated children raised by heterosexual parents, who have the opportunity to be adopted by their stepparents.

363.    North Carolina, unlike many other states, does not permit gay or lesbian second parents to adopt.  As a result, the Child Plaintiffs cannot be recognized as the lawful children of the Second Parent Plaintiffs unless the Legal Parent Plaintiffs terminate their parental rights.

364.    North Carolina law, however, allows similarly situated children of heterosexual couples to be adopted by their second parent, provided that their second parent becomes their stepparent through marriage, and lives with them for six months.

365.    The Child Plaintiffs are thus being denied legal protections as a result of circumstances that are beyond their control and flow solely from the status of their parents.

366.    North Carolina's statutory scheme for adoption of children, as definitively interpreted by the North Carolina Supreme Court, creates a class of children who cannot be adopted by their second parent under any circumstances.  The statutory scheme is unconstitutional on its face and as applied to the Child Plaintiffs, who are deprived of the many protections, rights and privileges that flow to other children for no reason other than the fact that

their parents are in a same-sex relationship, while children whose parents are heterosexual can be, and often are, adopted by stepparents.

367. This categorical exclusion is not narrowly tailored to further any compelling government interest and, in fact, is not even rationally related to the furtherance of any legitimate government interest.

368. Defendants' enforcement, under the color of state law, of North Carolina's adoption laws, including the categorical prohibition against second parent adoption by same-sex couples, deprives the Child Plaintiffs of their constitutional right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

369. Defendants' deprivation of the Child Plaintiffs' constitutional rights violates the Civil Rights Act, 42 U.S.C. § 1983.

370. The Child Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

371. Unless defendants are enjoined, they will apply and/or cause to be applied North Carolina's categorical prohibition against second parent adoption.

<div align="center">

**SECOND CLAIM FOR RELIEF**
(BY THE LEGAL AND SECOND PARENT PLAINTIFFS)
(PARENTS' RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF
THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983)

</div>

372. Plaintiffs repeat and reallege paragraphs 1 to 359 as if set forth in full.

373. North Carolina's categorical refusal to permit applications for second parent adoption by same-sex couples discriminates against those parents on the basis of their sexual orientation. In doing so, it deprives the Second Parent Plaintiffs of an opportunity to secure the benefits of a legal parent-child relationship, while those benefits would inure to similarly situated parents who are heterosexual. Relatedly, the denial of second parent adoption deprives the Legal

Parent Plaintiffs of the protection of having their co-parents also be legally responsible for caring for the children they are both raising together.

374.     The Second Parent Plaintiffs are denied an opportunity to secure the benefits of a legal parent-child relationship because the state does not permit gay or lesbian second parents to adopt, while heterosexual second parents can apply to adopt as stepparents.

375.     North Carolina's statutory scheme for adoption of children, as definitively interpreted by the North Carolina Supreme Court, is unconstitutional on its face and as applied to the Second Parent Plaintiffs because it violates the Equal Protection Clause of the United States Constitution by categorically depriving the Second Parent Plaintiffs of the ability to create a legal parent-child relationship on no basis other than the fact that they are in a same-sex relationship.

376.     North Carolina's adoption laws further burden the Legal Parent Plaintiffs by placing sole legal responsibility for their children on their shoulders, without allowing them to share that responsibility with a second parent, while heterosexual parents are able to share legal parenting responsibility by consenting to adoption by a stepparent.

377.     This categorical exclusion is not narrowly tailored to further any compelling government interest and, in fact, is not even rationally related to the furtherance of any legitimate government interest.

378.     Defendants' enforcement, under the color of state law, of North Carolina's adoption laws, including the categorical prohibition against second parent adoption by same-sex couples, deprives the Legal and Second Parent Plaintiffs of their constitutional right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

379.     Defendants' deprivation of the Legal and Second Parent Plaintiffs' constitutional rights violates the Civil Rights Act, 42 U.S.C. § 1983.

380.     The Parent Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

381.     Unless defendants are enjoined, they will apply and/or cause to be applied North Carolina's categorical prohibition against second parent adoption.

<div align="center">

**THIRD CLAIM FOR RELIEF**
(BY THE LEGAL PARENT PLAINTIFFS)
(PARENTS' RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE
UNITED STATES CONSTITUTION, 42 U.S.C. § 1983)

</div>

382.     Plaintiffs repeat and reallege paragraphs 1 to 359 as if set forth in full.

383.     Defendants' enforcement, under the color of state law, of North Carolina's adoption laws, including the categorical prohibition against consideration of applications for second parent adoption by same-sex couples, violates the Legal Parent Plaintiffs' fundamental right to parental autonomy protected by the Due Process Clause of the United States Constitution, by improperly burdening their fundamental right to make decisions concerning the care, custody and control of their children.

384.     North Carolina adoption law prevents the Legal Parent Plaintiffs from making fundamental decisions about their children that are central to their status as parents.  These decisions include (i) the ability to take steps to have the family they have created become legally recognized; (ii) the ability to take steps to support an application for their partner to apply to be the legal second parent of a child already within the Legal Parent's legal custody; (iii) the ability to support and contribute to the making of a legally certain determination of who will receive custody of their child in the event of the Legal Parent's death or incapacitation; (iv) the ability to support and contribute to the making of a legally certain determination of who will have the unquestioned ability to make decisions regarding their child's medical care; and (v) other decisions central to their child's health and well-being.

385.    This categorical exclusion is not narrowly tailored to further any compelling government interest and, in fact, is not even rationally related to the furtherance of any legitimate government interest.

386.    Defendants' deprivation of the Legal Parent Plaintiffs' constitutional rights violates the Civil Rights Act, 42 U.S.C. § 1983.

387.    The Legal Parent Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

388.    Unless defendants are enjoined, they will apply and/or cause to be applied North Carolina's categorical prohibition against second parent adoption.

### FOURTH CLAIM FOR RELIEF
#### (BY ALL PLAINTIFFS)
#### (DUE PROCESS CLAUSE UNDER THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983)

389.    Plaintiffs repeat and reallege paragraphs 1 to 359 as if set forth in full.

390.    Defendants' enforcement, under the color of state law, of North Carolina's adoption laws, including the categorical prohibition of second parent adoption by same-sex couples, will deprive the Legal and Second Parent Plaintiffs, and their children, the Child Plaintiffs, of their constitutional right to family integrity protected by the Due Process Clause of the United States Constitution.

391.    North Carolina's adoption laws categorically prohibit the Second Parent Plaintiffs from securing a legally recognized adoption of the Child Plaintiffs.  This deprivation in turn prevents plaintiffs from enjoying other protections, rights and benefits enumerated above, to which they would otherwise be entitled.

392.    By withholding from plaintiff families the protections that flow from legal recognition of the parent-child relationship that exists between the Second Parent Plaintiffs and

the Child Plaintiffs, the state burdens their constitutionally protected family integrity by creating uncertainty and insecurity, and denying these important legal protections and rights.

393. Defendants' deprivation of the Parent Plaintiffs' constitutional rights violates the Civil Rights Act, 42 U.S.C. § 1983.

394. The plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

395. Unless defendants are enjoined, they will apply and/or cause to be applied North Carolina's categorical prohibition against second parent adoption.

## FIFTH CLAIM FOR RELIEF
### (BY THE LEGAL AND SECOND PARENT PLAINTIFFS WHO ARE NOT MARRIED PLAINTIFFS) (EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983)

396. Plaintiffs repeat and reallege paragraphs 1 to 359 as if set forth in full.

397. Defendants' enforcement, under color of state law, of Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2 to prevent plaintiffs from marrying discriminates against plaintiffs on the basis of their sexual orientation and sex. By defining marriage as only "between one man and one woman," Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2 discriminate on the basis of sexual orientation and the basis of sex. For example, plaintiff Terri Beck is not permitted to marry plaintiff Leslie Zanaglio because both are in a same-sex relationship. If either was in a heterosexual relationship they would be permitted to marry their heterosexual partner. Plaintiffs Beck and Zanaglio also are not permitted to marry because both are women. If either plaintiff were a man, they would be permitted to marry. Amendment One and N.C. Gen Stat. §§ 51-1, 51-1.2 deprive these plaintiffs of an opportunity to achieve the benefits of marriage and avoid the

deprivation that results from the lack of an ability to marry, while such benefits are afforded similarly situated heterosexual couples who experience no such deprivations.

398. The discriminatory denial of these benefits and the vesting of these deprivations results from the enforcement of Amendment One and N.C. Gen, Stat. §§ 51-1, 51-1.2.

399. Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2 are unconstitutional on their face and as applied to these plaintiffs because they violate the Equal Protection Clause of the United States Constitution by categorically depriving these plaintiffs of the ability to marry in North Carolina.

400. This categorical exclusion is not narrowly tailored to further any compelling government interest and, in fact, is not even rationally related to the furtherance of any legitimate government interest.

401. Defendants' enforcement of Amendment One and N.C. Gen Stat. §§ 51-1, 51-1.2, under color of state law, deprives these plaintiffs of their constitutional right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution.

402. Defendants' deprivation of these plaintiffs' constitutional rights violates the Civil Right Act, 42 U.S.C. § 1983.

403. These plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

404. Unless defendants are enjoined, they will apply and/or cause to be applied Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2.

## SIXTH CLAIM FOR RELIEF
### (BY THE MARRIED PLAINTIFFS)
### (EQUAL PROTECTION CLAUSE UNDER THE UNITED STATES CONSTITUTION, 42 U.S.C. § 1983)

405. Plaintiffs repeat and reallege paragraphs 1 to 359 as if set forth in full.

406. Defendants' enforcement, under color of State law, of Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2 by refusing to deem valid or recognize the out of state marriages of the Married Plaintiffs — while North Carolina recognizes the out of state marriages of heterosexual couple — discriminates against the Married Plaintiffs on the basis of their sexual orientation and sex. For example, the marriage of plaintiffs Marcie Fisher-Borne and Chantelle Fisher-Borne would be recognized in North Carolina if either plaintiff had married a heterosexual spouse or if either plaintiff was a man. As a result of such discrimination, the Married Plaintiffs are deprived of the many benefits afforded heterosexual couples whose out-of-state marriages are recognized in North Carolina and who can then avoid the deprivation experienced by the Married Plaintiffs as a result of Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2.

407. The discriminatory denial of these benefits and the vesting of these deprivations results from the enforcement of Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2.

408. Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2 are unconstitutional on their face and as applied to the Married Plaintiffs because they violate the Equal Protection Clause of the United States Constitution by categorically depriving these plaintiffs of the recognition of their marriage in North Carolina.

409. This categorical exclusion is not narrowly tailored to further any compelling government interest and, in fact, is not even rationally related to the furtherance of any legitimate government interest.

410. Defendants' enforcement of Amendment One, under color of state law, deprives these plaintiffs of their constitutional right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution.

411.    Defendants' deprivation of these plaintiffs' constitutional rights violates the Civil

Right Act, 42 U.S.C. § 1983.

412.    These plaintiffs have no adequate remedy at law to redress the wrongs alleged

herein, which are of a continuing nature and will cause irreparable harm.

413.    Unless defendants are enjoined, they will apply and/or cause to be applied

Amendment One.

<div align="center">

### SEVENTH CLAIM FOR RELIEF
#### (BY THE CHILD PLAINTIFFS)
#### (EQUAL PROTECTION CLAUSE UNDER THE UNITED STATES
#### CONSTITUTION, 42 U.S.C. § 1983)

</div>

414.    Plaintiffs repeat and reallege paragraphs 1 to 359 as if set forth in full.

415.    Defendants' enforcement, under color of State law, of Amendment One and N.C.

Gen. Stat. §§ 51-1, 51-1.2 to prevent the parents of the Child Plaintiffs from marrying or from

having the out-of-state marriage of their parents recognized in North Carolina discriminates

against the Child Plaintiffs on the basis of their parents' sexual orientation and sex, and deprives

the Child Plaintiffs of the benefits enumerated above and causes the deprivations enumerated

above because the Child Plaintiffs' parents cannot have a marriage recognized in North Carolina.

416.    The damage and deprivations to the Child Plaintiffs caused by Amendment One

and N.C. Gen. Stat. §§ 51-1, 51-1.2 are separate and distinct from the damages and deprivations

to the adult plaintiffs caused by Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2.

417.    North Carolina would recognize and allow the marriage of heterosexual parents.

418.    The Child Plaintiffs are thus denied legal protections and subject to deprivations

as a result of circumstances that are beyond their control and flow solely from the status of their

parents.

419.     Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2 create a class of children who cannot have married parents or parents whose marriages are recognized in North Carolina.

420.     Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2 are thus unconstitutional on their face and as applied to the Child Plaintiffs, who are deprived of the benefits of having recognized married parents and who are subject to deprivation because their parents are not permitted to marry or have their out-of-state marriages recognized in North Carolina.

421.     This categorical exclusion is not narrowly tailored to further any compelling government interest and, in fact, is not even rationally related to the furtherance of any legitimate government interest.

422.     Defendants' enforcement of Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2, under color of state law, deprives these plaintiffs of their constitutional right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution.

423.     Defendants' deprivation of these plaintiffs' constitutional rights violates the Civil Right Act, 42 U.S.C. § 1983.

424.     These plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

425.     Unless defendants are enjoined, they will apply and/or cause to be applied Amendment One and N.C. Gen Stat. §§ 51-1, 51-1.2.

### EIGHTH CLAIM FOR RELIEF
**(BY THE MARRIED AND UNMARRIED PLAINTIFFS)**
**(DUE PROCESS CLAUSE OF THE UNITED STATES**
**CONSTITUTION, 42 U.S.C. § 1983)**

426.     Plaintiffs repeat and reallege paragraphs 1 to 359 as if set forth in full.

427.     Defendants' enforcement, under color of State law, of Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2 to prevent plaintiffs and other same-sex couples from marrying and

denying recognition to out-of-state marriages denies these plaintiffs the fundamental right to marriage protected by the Due Process Clause of the United States Constitution.

428.     This categorical exclusion is not narrowly tailored to further any compelling government interest and, in fact, is not even rationally related to the furtherance of any legitimate government interest.

429.     Defendants' enforcement of Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2, under color of state law, deprives these plaintiffs of their constitutional right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution.

430.     Defendants' deprivation of these plaintiffs' constitutional rights violates the Civil Right Act, 42 U.S.C. § 1983.

431.     These plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

432.     Unless defendants are enjoined, they will apply and/or cause to be applied Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

433.     A declaration that (a) the adoption provisions of North Carolina General Statutes §§ 48-1-100 *et seq.*, including N.C. Gen. Stat. §§ 48-1-106, 48-3-202, 48-4-100-103, as construed by the North Carolina Supreme Court, and (b) that Amendment One and N.C. Gen. Stat. §§ 51-1, 51-1.2 violate plaintiffs' rights to due process and equal protection under the United States Constitution and 42 U.S.C. § 1983, and that such laws are thus void and unenforceable.

434.    An order enjoining defendants and those acting in concert with them from enforcing and/or applying restrictions against (a) second parent adoption by same-sex couples and (b) marriages of same-sex couples either now or at any time in the future.

435.    An order directing defendants and those acting in concert with them to recognize and deem valid out-of-state marriages of same-sex couples to the same extent that out-of-state marriages of heterosexual couples are recognized and deemed valid.

436.    An order directing defendants to accept applications for adoption from the Second Parents and to process such applications consistently with stepparent adoption applications, or by any other procedure determined by defendants that provides a path for the Second Parents to secure second parent adoption consistent with that currently provided to stepparents.

437.    An order directing defendants to accept marriage applications from same-sex couples and to process such applications consistent with the way in which such applications from heterosexual applicants are processed.

438.    An order enjoining defendants from enforcing, under color of state law, Amendment One and/or N.C. Gen. Stat. §§ 51-1, 51-1.2 to prevent plaintiffs from marrying or to refuse to recognize their out-of-state marriages.

439.    An order awarding plaintiffs their costs, including their reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, to the extent permitted by law.

440.    An order awarding such other and further relief as the Court deems just and proper.

Dated: July 12, 2013
Raleigh, North Carolina

*Of Counsel:*

_____

Rose A. Saxe                                    Jonathan D. Sasser
James D. Esseks                                 N.C. State Bar No. 10028
American Civil Liberties Union Foundation       Jeremy M. Falcone
125 Broad Street                                N.C. State Bar No. 36182
New York, New York  10004-2400                  Ellis & Winters LLP
Telephone:  (212) 549-2500                      P.O. Box 33550
Facsimile:  (212) 549-2646                      Raleigh, North Carolina  27636
rsaxe@aclu.org                                  Telephone Number:  (919) 865-7000
jesseks@aclu.org                                Facsimile Number:  (919) 865-7010
                                                jon.sasser@elliswinters.com
                                                jeremy.falcone@elliswinters.com
Elizabeth O. Gill
American Civil Liberties Union Foundation       *Attorneys for the Plaintiffs*
39 Drumm Street
San Francisco, California  94111-4805
Telephone:  (415) 343-1237
Facsimile:  (415) 255-1478
egill@aclunc.org

Christopher Brook
N.C. State Bar No. 33838
ACLU of North Carolina
P.O. Box 28004
Raleigh, North Carolina  27611-8004
Telephone:  (919) 834-3466
Facsimile:  (866) 511-1344
cbrook@acluofnc.org

Garrard R. Beeney
David A. Castleman
Catherine M. Bradley
William R.A. Kleysteuber
Daniel W. Meyler
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
BeeneyG@sullcrom.com

## CERTIFICATE OF SERVICE

I hereby certify that on _____, 2013, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification of

such filing to all counsel of record.

<div style="margin-left: 50%;">

_____

Jonathan D. Sasser
N.C. State Bar No. 10028
Jeremy M. Falcone
N.C. State Bar No. 36182
Ellis & Winters LLP
P.O. Box 33550
Raleigh, North Carolina  27636
Telephone Number:  (919) 865-7000
Facsimile Number:  (919) 865-7010
jon.sasser@elliswinters.com
jeremy.falcone@elliswinters.com

*Attorneys for the Plaintiffs*

</div>